# Illinois Official Reports

## Appellate Court

---

### *People v. Miles*, 2020 IL App (1st) 171258

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK MILES, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-17-1258 |
| Filed | May 15, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-11891; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed; mittimus corrected. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Brett C. Zeeb, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Brenda K. Gibbs, and Gerrard R. Burch Jr., Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Mikva and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Derrick Miles, appeals his conviction, after a jury trial, of two counts of first degree murder. On appeal, defendant contends (1) the State's evidence was insufficient to prove him guilty beyond a reasonable doubt where the eyewitnesses' identifications were unreliable and no physical evidence connected defendant to the shooting, (2) the trial court improperly denied his motion for a continuance to obtain the testimony of a witness who would have corroborated the defense's theory of the case, (3) the trial court improperly barred defense counsel from publishing two photographs of the victim holding a gun, (4) he was denied his constitutional right to counsel and a fair trial when the trial court repeatedly interrupted defense counsel's closing argument and sustained its own objections, and (5) one of his convictions should be vacated pursuant to the one-act, one-crime rule. For the following reasons, we affirm but order the mittimus corrected to show one conviction of first degree murder pursuant to the greater offense of intentional murder.

¶ 2                                    I. JURISDICTION

¶ 3        The trial court denied defendant's motion to reconsider sentence on May 4, 2017. Defendant filed a notice of appeal on May 4, 2017. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    II. BACKGROUND

¶ 5        Defendant was charged by indictment with six counts of first degree murder in the shooting death of Marley Collins, also known as Malik.

¶ 6        At trial, Janique Miller testified that she lived at 1517 South Spaulding Avenue in Chicago, Illinois. On May 28, 2012, around 5:30 p.m., she was on her porch using Facebook on her phone. A few houses down, she saw Collins outside sitting and playing cards with friends. There were lots of people outside barbecuing, drinking, and getting high. Miller heard a gunshot coming from the gangway. When asked whether she saw a gun at this time, Miller responded, "I saw the gun, and then he got—he went through the gangway." Miller described the man with the gun as light-skinned with a shaved or bald head and hair on his chin and wearing a white shirt and khaki shorts. Miller testified that she did not know the man but she had seen him in the area earlier that day. When asked whether she saw the shooter in court, Miller responded, "I'm not sure."

¶ 7        Miller testified that she spoke with the police and she described the shooter as 5 feet, 11 inches tall, wearing tan shorts and a white shirt, with another white shirt across his chest and shoulders. On May 30, 2017, Miller viewed a physical lineup at the police station and identified defendant as the person who killed Collins. She also identified a photograph of defendant as the shooter.

¶ 8        At trial, Miller acknowledged that on August 17, 2015, she spoke with defense attorney Kathryn Lisco and investigator Rosa Silva. On that day, she signed a handwritten statement in which she stated that she was on her porch and heard one gunshot, but she did not see where the shot came from. She ran to another house for safety and did not see the person who shot

- 2 -

Collins, nor did she see anyone with a gun. Miller did see someone in the gangway, but she was too far away to notice the person's face or the clothes they were wearing. She noticed that the shooter wore the same shoes as someone she had seen walking in the neighborhood earlier that day. Miller identified three photographs of Collins shown to her on August 17, 2015, but after the State requested a sidebar, the trial court allowed publication of only one. Collins brandished handguns in the other photographs, and the trial court deemed them too prejudicial to publish to the jury.

¶ 9 Miller testified that she had lied during her interview on August 17, 2015, but now she was telling the truth. She had lied because she was off her medication and she was scared. She had been shot in an unrelated matter prior to the meeting. Miller reaffirmed that she did see a person with a gun in the gangway, and she saw that person shoot Collins. She stated that the person who shot Collins was the same person she had identified to police shortly after the incident.

¶ 10 Tracey Scott testified that on May 28, 2012, around 3:30 p.m., he and his son, Tracey Drisdell, arrived for a barbecue at 1505 South Spaulding Avenue. Scott saw Collins, who was related to his son and had gone to school with him. Others present included Martell Laura, Jamal Dortch, Irma Clay, Joseph "Boo" Vaughn, and Anthony Drisdell (Drisdell). Scott also saw someone, who he later identified in court as defendant, "[j]ust pacing in the area, walking back and forth by the vacant lot around people." He had never met defendant and did not know his name. Scott sat down and defendant came up behind him. When Scott asked defendant what he was doing behind him, defendant replied that he was waiting for Irma to bring him a Swisher from the store.

¶ 11 Around 5 p.m., Scott was in front of the house at 1505 South Spaulding Avenue and Drisdell was washing his car by the tree. Scott sat in a chair while he talked to Vaughn, and Collins sat in a chair next to Scott. Defendant, who was behind them, pulled out a black gun and said, "I got your b*** a***." He then fired one shot at Collins "really close" and ran through the alley toward Sawyer Avenue. On May 29, 2012, Scott met with police and, after viewing photographs, identified defendant as the person who shot Collins. The following day, Scott met with an assistant state's attorney and a detective, and again he identified a photograph of defendant as the shooter.

¶ 12 At trial, Scott acknowledged that on October 15, 2015, he spoke with defense attorney Lisco and investigator Silva. On that day, he signed a statement in which he indicated he did not see the shooter, did not know who the shooter was, and did not see defendant shoot anyone. He was shown a photograph of defendant, and on the back he wrote, "I didn't see him shoot nobody." Scott signed and dated the photograph. Scott testified that in 2015 he had changed his statement because "my life was threatened." He testified that his 2015 statement was not true and that his earlier statement about what happened on May 28, 2012, was the truth.

¶ 13 Drisdell testified that in May 2012, he lived at 1505 South Spaulding Avenue with his parents. He had a 2004 felony conviction for state benefits fraud, and he completed his sentence of probation. He has been an online academic advisor since May of 2016. On May 28, 2012, he was home celebrating Memorial Day with his family. He saw his Aunt Irma outside, and Vaughn and Collins were sitting and talking. He also saw Scott and Scott's son. Defendant was on the porch at 1511 South Spaulding Avenue talking to one of the guys who lived next door. Drisdell had never seen defendant before, but he stood in front of defendant and talked to him "about things in the neighborhood." Drisdell identified defendant in open court.

¶ 14     Around 5:30 p.m., Drisdell's fiancée parked her car in front of his house. He went to clean the car because the kids who greeted his fiancée left fingerprints on it. As he wiped the front fender, he noticed Scott sitting in a chair along with Collins and Vaughn. Defendant was standing behind Collins. Defendant pulled up his shirt, took a black gun from his waistband, and said, "I got your a***." He shot Collins once and fled through the vacant lot. Drisdell ran and called 911. He testified that he had seen defendant "pretty much all day" and got a good look at the shooter's face because the shooting happened about 8 to 10 feet away. At the scene, Drisdell described the shooter to police as 5 feet, 9 or 10 inches tall, 170 to 180 pounds, light-skinned, bald, and wearing dark blue jeans and a T-shirt.

¶ 15     The next day, Drisdell met with police and viewed a physical lineup. He identified defendant as the person who shot Collins. Drisdell also identified defendant in a photograph. Drisdell testified that he requested relocation services from the state's attorney's office because he was afraid to live at his home where the murder occurred. He was provided with a security deposit, first month's rent, and moving expenses.

¶ 16     Simone Birden testified that on May 28, 2012, she lived at 1511 South Spaulding Avenue. Defendant came to her apartment that afternoon. She had known him for about a year. They spoke for three to five minutes, and defendant asked for Birden's phone number. After she gave him her number, she hugged him and he left. Birden testified that when she hugged defendant, she had her arms around him and did not feel a gun on him. She subsequently testified that she touched him around the waist.

¶ 17     About 20 minutes after defendant left, Birden heard one gunshot, and she went outside 5 minutes later. After the shooting, Birden saw a lot of people running south, but she did not see anyone with a gun. When police arrived, she told them that defendant had visited her home. She went to the police station and identified a photograph of defendant, but she did not identify defendant as the shooter because she did not witness the shooting. Birden signed a handwritten statement indicating that defendant told her he would come back later and that she did not see the shooting.

¶ 18     Paramedic Joshua Kowalczyk testified that on May 28, 2012, he and his partner arrived at 1505 South Spaulding Avenue to a "somewhat hectic" scene. They found Collins lying on his back, unresponsive and not breathing. There was a "slight graze wound" and a gunshot wound near Collins's belly button. Since the crowd was unruly, Kowalczyk and his partner provided routine trauma care and then transported Collins to Mt. Sinai Hospital for further medical care.

¶ 19     Evidence technician Terrance McKitterick testified that he and his partner processed the crime scene and recovered a Winchester .45-caliber auto fired cartridge case. In the east alley, McKitterick found what he suspected was blood, and he swabbed the substance. He did not find any other physical evidence.

¶ 20     The parties stipulated that forensic scientist John Onstwedder would testify that he found no latent impressions suitable for comparison on the shell casing. Forensic scientist Francesca Antonacci would testify that no blood was found on the swab taken at the crime scene.

¶ 21     Medical examiner Lauren Moser-Woertz testified that she performed a postmortem examination on Collins. She found a gunshot wound in his abdomen and recovered a deformed copper jacketed projectile. He also had a graze wound "superior to the entrance wound." The direction of the wound path was front to back and downward. She found no evidence of contact or close range firing around the entrance wound. The cause of death was a gunshot wound, and the manner of death was homicide.

¶ 22    Tajuana West testified for the defense. She stated that on May 28, 2012, she was at 15th Street and Spaulding Avenue, walking home from her grandmother's house, when she heard a gunshot. She looked up and saw a man fall to the ground. She saw "another man take off running, throw something in the bushes, run through the light and then down the alley." West saw the man's face and described him as thin; light-skinned; 5 feet, 9 inches tall; and wearing a white tank top and khakis. West did not know anyone from the area and did not want to be at trial. She was testifying only because she had been subpoenaed.

¶ 23    On cross-examination, West stated that the person who ran away from the victim was the only person she had seen on the street. She "did not exactly" see someone shoot Collins, but she saw a person run from the body and throw something into the bushes. She did not see a group of people and assumed the person running away was the shooter. West called 911, and when police arrived, she tried to tell them what happened, but they handcuffed her and put her in a car for over an hour with the windows up. She told the officers that she saw the shooter throw something in the bushes. West tried to tell them that they were looking in the wrong spot for the gun, but they were not interested. The police let her go after "mak[ing] sure she had no warrants or nothing else on her background." She refused to view photographs because she disliked how she was treated.

¶ 24    On March 13, 2015, defense attorney Lisco and investigator Silva came to West's house and showed her four photographs of the same person. She told them that it looked like the person she saw at the scene, but she was not sure. West signed two photographs that she thought looked like the man who threw something in the bushes. The man in the photographs was not defendant. On August 14, 2015, Detectives Jones and Esparza visited West, and she told them that an attorney showed her photographs of someone who looked like the shooter. She told the detectives that she saw the shooter's face and that he threw an object into the bushes. She had tried to tell police at the scene what happened, but she was handcuffed and placed in a car for over an hour. West stated that she saw the shooter throw a black gun in the bushes, but no one listened to her at the time. On November 14, 2016, attorney Lisco visited West again and showed her one photograph of defendant. West identified the photograph as someone who "was not the shooter."

¶ 25    West testified that she did not know defendant, she denied he was the person she saw with a gun who threw something in the bushes, and she did not know Collins or anyone who lived in the area.

¶ 26    The parties stipulated that Officer Manuel Ramirez would testify that on May 28, 2012, he and his partner responded to a call of a person shot at 1503 South Spaulding Avenue. He met with West at the scene, and she described the shooter as a "male black, five nine, weighing between 150, 160 pounds, black hair with a fade hairstyle, light brown complexion, wearing a white tank top and tan cargo pants." West did not tell him that the shooter put something in the bushes. She informed him that the shooter fled eastbound from 15th Street.

¶ 27    In rebuttal, Officer Angel Mendez testified that on May 28, 2012, he responded to a call of a shooting in the 1500 block of South Spaulding Avenue. He did not speak with West nor did he see a female handcuffed in a police car. Detective Jones testified that he did not speak with West at the scene, he never saw a woman in handcuffs, and he never saw anyone in the back of a police car. He spoke with West for the first time on August 14, 2015, after he learned that defense counsel and an investigator had previously interviewed her. Jones showed West the same photographs defense counsel had shown her of a person who was not defendant but who

West had said looked like the person who threw something in the bushes. However, West told Jones that "she could not actually see the face of the shooter" and she never saw anyone with a gun. Jones did not set up an identification for West because she had told him she did not see the shooter's face.

¶ 28    The jury found defendant guilty of first degree murder and that, during the commission of the offense, he personally discharged a firearm that proximately caused death. The trial court denied defendant's motion for a new trial and sentenced him to 60 years' imprisonment. Defendant filed a motion to reconsider sentence, which was denied. This appeal followed.

¶ 29                                    III. ANALYSIS

¶ 30    Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence used to convict him, we determine whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). The jury, as fact finder, determines the credibility of witnesses and the weight to be given their testimony, and this court will not substitute its judgment for that of the jury on these matters. *People v. Brooks*, 187 Ill. 2d 91, 132 (1999). Defendant's conviction will not be overturned unless the evidence "is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 31    Defendant contends that he was convicted based on eyewitness testimony identifying him as the shooter, but the testimony was unreliable. He points out that Miller only heard a gunshot and she never testified that she actually saw Collins get shot. Scott testified that Collins was shot at close range, which was contradicted by the medical examiner who found no evidence of close range firing. Drisdell testified that defendant pulled a gun out of his waistband, but Birden testified that she did not feel a gun on defendant when she hugged him. Furthermore, both Miller and Scott signed handwritten statements in 2015 stating that they did not see the shooter's face and did not know who shot Collins. Scott also signed a photograph of defendant in 2015 and wrote on the back, "I didn't see him shoot nobody." Defendant argues that Anthony Drisdell, the third witness who identified defendant as the shooter, was not credible because he received a benefit from the prosecution in the form of rent, a security deposit, and moving expenses. Given that no physical evidence connected him to the shooting, defendant contends their unreliable testimony was insufficient to convict him beyond a reasonable doubt.

¶ 32    We disagree. While Miller and Scott gave statements to defense counsel in 2015 that they did not see the shooter and did not know who shot Collins, both gave prior statements at the time of the murder that they had seen the shooter and identified defendant as the person who shot Collins. At trial, both eyewitnesses acknowledged that they lied to defense counsel in 2015 because they were afraid, but they confirmed that their prior identification of defendant as the shooter was true. Although Miller and Scott made prior inconsistent statements regarding the identification of the shooter, the jury heard this evidence, and it is the jury's responsibility to resolve factual disputes and assess the credibility of witnesses. *People v. White*, 2011 IL App (1st) 092852, ¶ 78; see also *Brooks*, 187 Ill. 2d at 132 (finding that it is for the trier of fact to determine the credibility of recantation testimony). The jury clearly believed Miller and Scott when they testified that their identification of defendant as the shooter was the truth.

¶ 33    The critical inquiry here is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that defendant shot Collins beyond a reasonable doubt. *People v. Green*, 2017 IL App (1st) 152513, ¶ 102. When evaluating the reliability of identification testimony, we consider (1) the opportunity the witness had to view the offender, (2) the witness's degree of attention, (3) the accuracy of the witness's description of the offender, (4) the witness's level of certainty regarding the identification, and (5) the length of time between the event and the witness's identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989).

¶ 34    Eyewitnesses Miller, Scott, and Drisdell testified that they were outside near 1505 South Spaulding Avenue on the day of the incident. Each stated that defendant was in the area for some time before the shooting so they had an opportunity to observe him. All testified that they heard one gunshot and saw a person with a gun flee the scene. They described the person as 5 feet, 9 inches to 5 feet, 11 inches tall and light-skinned, and Miller and Drisdell described him as wearing a white T-shirt and shorts. Defense witness West gave a similar description of the suspect. Shortly after the incident, Miller, Scott, and Drisdell separately viewed photographs and/or a lineup and unequivocally identified defendant as the person who was at the scene with a gun. Although there were minor inconsistencies in their testimony regarding the exact clothes the shooter was wearing, whether the shooter came from the gangway or was standing behind Collins right before he was shot, or whether defendant pulled the gun from his waistband, that is expected when people view the same event under traumatic circumstances. *Brooks*, 187 Ill. 2d at 133. Given the strength of the identification testimony, we do not find that the minor discrepancies and lack of physical evidence raise a reasonable doubt that defendant shot Collins. See *People v. Rodriguez*, 2012 IL App (1st) 072758-B, ¶ 48 (finding that "lack of physical evidence and minor inconsistencies do not render the evidence so unreasonable, improbable or unsatisfactory to justify reversal of the jury's determination").

¶ 35    Defendant argues, however, that Drisdell was not a credible witness because he received benefits from the State in the form of rent, a security deposit, and moving expenses. He contends that West, the only eyewitness who did not identify defendant as the shooter, was the most credible because she did not know anyone involved in the case and appeared only pursuant to a subpoena.

¶ 36    The testimony of a witness who received a benefit from the State is not unreliable *per se*; rather, as with other witness testimony, it is for the trier of fact to determine the witness's credibility and the weight to be given his or her testimony. *People v. Wheeler*, 401 Ill. App. 3d 304, 310-11 (2010). Even if we exclude Drisdell as a credible witness, Miller and Scott remain as witnesses who identified defendant as the shooter. "[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). While West did not identify defendant as the shooter, her description of the shooter matched that given by Miller and Scott. Also, the jury heard West's testimony and, as was its duty, weighed that evidence against other witness testimony. This court will not substitute its judgment for that of the jury on these matters. We find that the evidence, viewed in the light most favorable to the State, was sufficient to convict defendant of first degree murder beyond a reasonable doubt.

¶ 37    Defendant next contends that the trial court improperly denied his motion for a continuance to obtain the testimony of witness Martell Laura. Section 114-4(b)(3) of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/114-4(b)(3) (West 2016)), provides that a

written motion for a continuance made more than 30 days after arraignment may be granted if "[a] material witness is unavailable and the defense will be prejudiced by the absence of his testimony." We review the trial court's denial of a continuance for abuse of discretion. *People v. Flores*, 269 Ill. App. 3d 196, 201 (1995). However, we will reverse the trial court's determination only if the court abused its discretion and denial of the continuance prejudiced the defendant. *People v. Ward*, 154 Ill. 2d 272, 304 (1992).

¶ 38        Defendant's trial was set for August 22, 2016, but because the State could not locate several witnesses it wished to call, the trial was continued to November 14, 2016. On August 25, 2016, the trial court admonished Martell that he had to appear on November 14, 2016, but Martell failed to appear. The State informed the court, "our office did speak with him this morning. He is aware of today's court date, he is in fear, does not want to come to court." The trial court held the case over to the next day and issued a warrant for Martell to appear. Defense counsel spoke with Martell and arranged to transport him to the court to turn himself in on the warrant. However, Martell "was not present at the prearranged time and location." The trial court granted a continuance until November 30, 2016, and Martell was informed of the new trial date. Again, Martell did not appear, and the court granted defense counsel a continuance until January 9, 2017.

¶ 39        On January 9, 2017, defendant's trial was set to begin, but Martell failed to show up in court as a witness. Defense counsel filed a motion for a continuance pursuant to section 114-4, arguing that Martell's testimony was material and would corroborate the defense's theory of the case. The trial court denied the motion. As the court explained at the hearing on defendant's motion for a new trial, "[t]his case has been pending since 2012. Mr. Laura was advised to be here. I had given continuance [*sic*] to get people here. He did not appear." The court had given continuances to the defense on November 14, 2016, and on November 30, 2016, to procure its witness. The trial court "advised the defense again 1-9-17 was the date. [The case] had been pending for five years and the court was doing everything it could to bring it to trial."

¶ 40        When reviewing a denial of a request for a continuance to secure the presence of a witness, we consider (1) the diligence of defendant, (2) whether defendant has shown that the testimony was material and may have affected the verdict, and (3) whether the exclusion of the testimony prejudiced defendant. *People v. McClain*, 343 Ill. App. 3d 1122, 1130 (2003). Even if we find that counsel was diligent in attempting to get Martell to court, defendant must also show that Martell's testimony was material and its exclusion prejudiced him at trial. See *People v. Gardner*, 282 Ill. App. 3d 209, 215 (1996).

¶ 41        Defendant's contention is based on two handwritten statements. In a May 30, 2012, statement, Martell told the assistant state's attorney that on May 28, 2012, he was in the area of 1503 South Spaulding Avenue hanging out with Collins. Defendant approached and asked if anyone had a phone. Defendant asked Irma to get something from the store. Defendant started walking back and forth, listening to Martell's conversation with Collins. When Irma came back from the store, Martell heard "a loud gun shot" and Collins fell down. Martell ran from the scene. He stated that defendant was the only person standing behind him when Collins was shot.

¶ 42        On October 2, 2014, Martell gave a statement to defense attorney Lisco and investigator Rosa at the Graham Correctional Center. Martell stated that he and Collins were members of the Sicko Boys gang and, five days before Collins was killed, he and Collins were involved in

a fight with the Breeds, a gang with territory near the Sicko Boys' territory. Martell stated that "we whooped them real good." Martell further stated that on May 28, 2012, he was outside 1505 South Spaulding Avenue with Vaughan. He saw Vaughan's Aunt Irma walking toward them when he heard two shots from behind. He "hit the ground and lay on his stomach." Martell did not see the shooter nor did he see the shooter fire a gun. After firing the shots, the shooter ran toward Kedzie Avenue. Martell also stated that "the dude who shot" Collins was on house arrest at 1515 South Spaulding Avenue.

¶ 43    Martell also stated that "he is thirsty for revenge against Derrick Miles." While he was in Cook County jail, Martell "learned where Derrick Miles was being housed" and "he purposely got himself transferred from Division 5 to Division 1 so that he could kill Derrick Miles." He also sent a message to fellow Sicko Boys gang members "to smash Derrick Miles on sight."

¶ 44    Defendant argues that Martell's testimony was material because it would have supported the defense's theory that Collins was shot in retaliation by a rival gang member rather than defendant. Martell stated that he and Collins were members of the Sicko Boys gang and they were involved in a fight with a rival gang days before Collins was killed. Evidence of gang membership or involvement in gang-related activity, however, is admissible only if sufficient proof exists that such membership or activity is related to the crime charged. *People v. Smith*, 141 Ill. 2d 40, 58 (1990). Martell never connected the shooting of Collins, or anything else happening that day, to the gang-related fight.

¶ 45    Furthermore, Martell's other gang-related statements tended to implicate rather than exclude defendant as the shooter, which may explain his reluctance to testify in court. Martell stated that he was so "thirsty for revenge" against defendant that he got himself transferred to defendant's division so he could kill him, and he sent a message to his gang to "smash" defendant. Since Martell and Collins belonged to the same gang, it is not surprising that Martell would want revenge against defendant if he believed defendant was the person who killed Collins. For these reasons, testimony that Martell and Collins were involved in a gang-related fight prior to the shooting was not material and would not have affected the outcome of the case.

¶ 46    We also find that the absence of Martell's testimony at trial did not prejudice defendant. Martell's statements placed defendant at the scene when the shooting occurred, and he identified defendant as the only person behind Collins before he was shot. As such, his statements regarding the shooting substantially corroborated the accounts given by State witnesses Miller, Scott, and Drisdell, all of whom positively identified defendant as the shooter. While defendant contends he was never on house arrest, which is contrary to Martell's statement of the shooter, that inconsistency by itself does not exclude defendant as the shooter. Martell may have merely been mistaken about defendant being under house arrest. Viewed as a whole, Martell's statements regarding the shooting were substantially cumulative to the overwhelming evidence identifying defendant as the shooter. As such, defendant has not shown prejudice so as to merit a reversal of his conviction. See *People v. Cox*, 377 Ill. App. 3d 690, 706 (2007).

¶ 47    Defendant makes a related argument that the trial court erred in allowing the defense to publish only one of three photographs that Miller had identified as photos of Collins. The two photographs not published showed Collins brandishing a handgun. Defendant argues that the unpublished photographs "were material and probative because they supported the defense theory that Collins was a gang member who had been in a fight with a rival gang five days

prior to his death, and that he was shot in retaliation by a rival gang member." Since the defense could not show these photographs to the jury, "coupled with the trial court's denial of the defense motion for a continuance," the defense had to abandon its theory that another person shot Collins due to a dispute between rival gangs.

¶ 48    It is within the trial court's discretion to weigh the probative value and potentially prejudicial effect of photographs of the victim. *People v. Armstrong*, 183 Ill. 2d 130, 147 (1998). "Even gruesome or disgusting photographs may be properly admitted into evidence if they are relevant to establish any fact at issue in the case." *Id.* Defendant contends that these photos were relevant to show Collins was a gang member, but he does not cite any cases finding that a person's mere possession of a gun is evidence of gang membership. No evidence presented at trial connected the shooting of Collins to gang-related activity; Martell's statements also made no such connection. The trial court found the photographs far more prejudicial than probative, and its determination was not an abuse of discretion.

¶ 49    Defendant next contends that he was denied his constitutional right to counsel and a fair trial where the trial court repeatedly interrupted defense counsel's closing argument and sustained its own objections. Defendant has a fundamental right to make a proper closing argument in his favor based on the evidence and applicable law. *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003). This right is derived from defendant's constitutional right to effective assistance of counsel. *Id.* If defendant was denied his right to make a proper closing argument, his conviction will be reversed regardless of whether he was prejudiced by the error. *Id.*

¶ 50    Defendant is denied his right to make a proper closing argument if the trial court repeatedly interrupts counsel so as to curtail his closing argument. See *People v. Heiman*, 286 Ill. App. 3d 102, 112-13 (1996) (the trial court interrupted defense counsel's argument 40 to 50 times); *People v. Crawford*, 343 Ill. App. 3d 1050, 1060 (2003) (trial court interrupted defense counsel after two sentences and most of counsel's closing argument was interrupted). These interruptions are often in the form of a rebuttal or other expression of the court's opposition to defense counsel's argument and reveal the court's bias against defendant. *Crawford*, 343 Ill. App. 3d at 1060-61; see also *People v. Mays*, 188 Ill. App. 3d 974, 982-83 (1989) (the trial judge's slamming of his pencil, heaving a sigh, and his facial gestures in response to defense counsel's questions showed the judge "presumed the worst of defendant").

¶ 51    Unlike the trial court in *Heiman* and *Crawford*, the trial court here did not repeatedly interrupt defense counsel with rebuttal so as to curtail her closing argument. Defense counsel was well into her argument when the trial court first objected to her statements on reasonable doubt. The following exchange occurred:

> "MS. LISCO: And it's the state, the state and the state alone, not the defense, who has the burden of proof. They must prove to you that they do have the right person beyond a reasonable doubt. Now, some of you have sat on civil juries before, where the evidence burden of proof was preponderance of evidence, a tipping of the scales.
>
> THE COURT: Ladies and gentlemen, sustained. Counsel will not define reasonable doubt. The jury will define reasonable doubt themselves.
>
> MS. LISCO: Well, proof beyond a reasonable doubt is a higher standard that that [*sic*] ladies and gentlemen. It requires more convincing evidence. So these disjointed, mismatching fragments do not comply with proof beyond a reasonable doubt. They don't meet that burden and I'll tell you why. Because the details are important."

Defense counsel proceeded to tell the jury about the inconsistencies in the eyewitness testimony. Counsel went through the testimony of Miller and Scott. When she spoke of Drisdell, defense counsel emphasized his felony conviction and the fact he was paid to relocate. She called him a "fraudster." Then the following occurred:

"MS. LISCO: Academic Advisor? Really? With a felony conviction? Do you think academic advisors are supposed to have felony convictions when they're advising students and oftentimes our youth? I don't think so. Now, he said he had that job since May of—

THE COURT: Sustained as to what you think, Miss Lisco. The jury will disregard attorneys' opinions. Attorneys' opinions are not evidence and should not be considered by you as evidence."

Counsel discussed the inconsistent statements of Miller and Scott. Regarding Scott, defense counsel argued:

"I can tell you now, ladies and gentlemen, that this statement that he made—and make no mistake, this is his statement—he wrote it in his own handwriting—is irreconcilable with his testimony on the witness stand. You have a reasonable doubt right there, ladies and gentlemen. Was he lying then? Is he lying now? Which is it? You can't have it both ways."

The trial court did not object to this argument. The trial court did not sustain an objection until the State objected to defense counsel's statement that "There's a blue light camera on almost every block in this neighborhood, ladies and gentlemen." After the State objected, the following transpired:

"THE COURT: Sustained. Ladies and gentlemen there's been no testified [*sic*] presentedof such evidence. That's stricken and disregarded. Continue with your argument, Miss Lisco, but not with regard to pod cameras.

MS. LISCO: Judge, you're absolutely right. Ladies and gentlemen, there's no evidence of any pod camera in this case.

THE COURT: Nor any existing out there. There's no evidence they existed in the area."

Toward the end of defense counsel's closing argument, she returned to the concept of reasonable doubt:

"MS. LISCO: The defense asks you to be critical of the evidence that you heard in this case. Look at the quality of that evidence as well, not just the quantity. If it leaves you wondering, then that's reasonable doubt.

THE COURT: Sustained. Ladies and gentlemen, that will be stricken from the record. Again, the jurors are the determinants of what is reasonable doubt, not the attorneys.

MS. LISCO: You absolutely are the determiners of what's reasonable doubt, ladies and gentlemen. And if you're wondering which of the conflicting stories of Janique Miller or Tracey Scott to believe, that's reasonable doubt.

THE COURT: Sustained. Again, stricken. The jury will disregard. The jury will decide what is reasonable doubt, not the attorneys."

¶ 52     We find this case distinguishable from *Heiman*, *Crawford*, and *Mays*. Defense counsel's closing argument comprised almost 33 pages of record, and the trial court interrupted her only

- 11 -

four times. We also find no indication that defense counsel was unable to fully present defendant's theory of the case that he was innocent and the testimony of the State's witnesses was unbelievable. Nor do we find that the trial court's statements reflect an opposition to defense counsel's arguments in the case. The trial court has discretion to regulate the substance and style of closing arguments, and we will not disturb its determination on the propriety of remarks absent an abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 128 (2001). After reviewing the record, we cannot say that the trial court's rulings were arbitrary, fanciful, or unreasonable or that no reasonable person would take the trial court's view. See *People v. Hall*, 195 Ill. 2d 1, 20 (2000).

¶ 53    Defendant, however, takes issue with the trial court's two objections to defense counsel's statements on reasonable doubt, arguing that "the jury was left with the impression that the judge disagreed with defense counsel's summation of the State's evidence, and that the defense counsel had done something very wrong." We disagree. Our supreme court has made clear "that neither the court nor counsel should attempt to define the reasonable doubt standard for the jury." *People v. Speight*, 153 Ill. 2d 365, 374 (1992). Courts disfavor attempts by counsel to explain the reasonable doubt standard because "no matter how well-intentioned, the attempt may distort the standard to the prejudice of the defendant." *People v. Keene*, 169 Ill. 2d 1, 24-25 (1995). Counsel may discuss reasonable doubt and her view of the evidence and suggest whether the evidence supports reasonable doubt. *People v. Laugharn*, 297 Ill. App. 3d 807, 811 (1998). Here, the trial court did not allow defense counsel to tell the jury that if the evidence leaves you wondering, "that's reasonable doubt," but it did allow counsel to suggest that the inconsistent statements by Scott supported reasonable doubt. We find no reversible error here.

¶ 54    As to defendant's final contention, the State agrees that under the one-act, one-crime doctrine, defendant's mittimus should be corrected to reflect only one conviction on count IV, which is the greater offense of intentional murder. See *People v. Artis*, 232 Ill. 2d 156, 170 (2009) (holding "that under the one-act, one-crime doctrine, sentence should be imposed on the more serious offense and the less serious offense should be vacated"). Therefore, we order the mittimus corrected to reflect only one conviction on the more serious offense.

¶ 55                               IV. CONCLUSION

¶ 56    For the foregoing reasons, defendant's conviction is affirmed. We order the mittimus corrected to reflect one conviction of first degree murder on count IV, the more serious offense of intentional murder.

¶ 57    Affirmed; mittimus corrected.