2022 IL App (1st) 170759-U

FIFTH DIVISION
April 8, 2022

No. 1-17-0759

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | 11 CR 11313-02 |
| | ) | |
| TYRIS SMITH, | ) | Honorable William G. Lacy, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

*Held:* A rational trier of fact could have found defendant guilty beyond a reasonable doubt; the State did not violate the trial court's pretrial ruling regarding gang evidence; the State's references to evidence related to prior bad acts and defendant's custodial status did not prejudice him; defendant did not receive ineffective assistance of trial counsel. Affirmed.

¶ 1    Following a jury trial, defendant, Tyris Smith, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2002)) and sentenced to natural life in prison, plus 20 years for personally discharging a firearm. On appeal, Smith contends that (1) the State's use of gang evidence violated the trial court's pretrial ruling, (2) the State's repeated references to his involvement in drug dealing presented prior bad act evidence to the jury and prejudiced his right

to a fair trial, (3) the State's questioning him regarding his custodial status violated his right to a fair trial, and (4) the identification evidence was insufficient. He also contends that trial counsel was ineffective on a number of grounds.

¶ 2                                      I. BACKGROUND

¶ 3       In June 2002, Dorothy Richardson and Tina Jackson were shot and killed and Saleema Muhammad was shot and injured near 5039 West Madison, in Chicago. In 2011, Smith and a co-defendant were arrested and charged with first degree murder. Smith's trial took place in 2015.

¶ 4                           Pre-Trial Motion on Gang Evidence

¶ 5       Before trial, the State requested that gang evidence be admitted for "a specific purpose" through a witness named Patrick Bray to explain the circumstances surrounding alleged conversations that took place between Smith and Bray after the shooting. In response, Smith asserted that gang evidence was not relevant. Smith also filed a motion *in limine* to bar the State from eliciting any testimony concerning gang affiliations.

¶ 6       At a hearing on the matter, the State contended that Smith was a member of the Mafia Insane Vice Lords and Bray was his gang chief. After the shooting, Smith made an admission to Bray. According to the State, "the murders weren't gang related but the statement was gang related." In response, defense counsel argued that the State's purpose was to prejudice Smith and there were other reasons to explain Bray and Smith's relationship. Counsel explained that the men were close friends and "dealt drugs together," which was "going to come in because of the federal conviction." Counsel further stated that Bray was Smith's confidant, "which may explain why [Smith] would take him into his confidences if that's what he is trying to say." The following colloquy then occurred:

"THE COURT: Okay. Now, you just said that your client and Mr. Bray dealt drugs

together? You have no objection to that coming in?

MS. CARBELLOS [(DEFENSE ATTORNEY)]: They were involved in the drug

activity that subsequently led to a federal—yes, they were. They were all part—

THE COURT: So you don't think—

MS. CARBELLOS: In a way I think it's less than the gang thing."

The court then continued the hearing to address another motion *in limine.* The court took under

advisement the State's motion concerning gang evidence and Smith's motion *in limine* that

requested the State be barred from eliciting any testimony concerning gang affiliations.

¶ 7        In an oral ruling, the court noted that the State filed its motion "for the sole purpose of

establishing the context of a statement or statements made by the defendant to a Patrick Bray

(ph), [*sic*] that being that Mr. Bray was the defendant's superior and a high-ranking member of

the same gang." Smith had conceded that the jury would hear that he was a drug dealer, involved

in criminal activity, and had testified against Bray in a drug case. The court stated that the jury

should know all the circumstances under which Smith's alleged statements were made and if so,

the weight to be given to the statements. The court concluded:

"The minimal amount of gang evidence is highly relevant to the circumstances

surrounding the alleged statement of the defendant and more probative to the issue than

prejudicial to the defendant. The motion to allow the introduction of gang evidence for

this limited purpose and for the purpose stated above is granted over the defendant's

objection."

¶ 8                                      Trial

¶ 9                                State's Witnesses

¶ 10    Elissia Robinson testified that around midnight on June 23, 2002, she went to a vacant lot across the street from a club near Madison Street and Lavergne Avenue in Chicago with Richardson and some of her friends. Many people were in the lot. While drinking and intoxicated, Robinson and her friends danced. A man she did not know approached her, dropped two $50 dollar bills on the ground, and said, "[L]et's dance." The man who dropped the money on the ground came from a "light-colored SUV" and the man's "friend" also got out of the SUV. She thought the man was wearing a white t-shirt and described him as being "5'8", 5'2"—5'8" to 5'10" and dark skinned. He had "a little afro" and "some sort of space in his teeth," which could have been a gap or chip. The money went missing, whereupon the man became very agitated and grabbed Robinson's right arm. As he was holding her arm, Robinson's friend, Latina, sprayed mace at the man's face. Robinson pulled her arm away and cut the man with a knife she had been holding. She saw "a small amount" of blood on the knife.  Robinson eventually left the lot. Robinson spoke with the police the next morning and gave them the knife. On July 16, 2008, Robinson met with Chicago police detective Dino Amato and looked at a group of photographs, but she could not identify anyone.

¶ 11    Ladonna Thompson,[1] who had a 2008 conviction for forgery, testified that at 5 a.m. on June 23, 2002, she was in the area of 5039 West Madison to go to a nightclub with some friends. When she left a couple hours later, she walked to a vacant lot across the street and was picked up by a friend who drove a van. When the van drove off, Ladonna saw two men with guns approaching the vacant lot. One of the men had a towel around his head and there was a little blood on the towel underneath his chin. She testified that his face was uncovered, and she got a good look at his face. The man wearing the towel was the first person she saw, and he was

---

[1] Ladonna Thompson shares the last name as another witness, so we will refer to her by her first name.

shorter than the other man and had a bigger weapon. He looked in the van's direction. Ladonna had a "nice good glance" at the two men, who were "jogging" or "like a power walk" past her. It was light outside and the streetlights were on. Ladonna lost sight of the men as they turned into the vacant lot. Ladonna then heard about 9 or 10 gunshots and saw that Richardson and another young woman had been shot. Ladonna did not tell the police what happened that night or about the two men with guns because she was afraid. However, she spoke with Detective Amato about the case in 2008. Ladonna described the first man as having worn an orange shirt and being 5'10" to 6'0." At trial, Ladonna identified the photo arrays she viewed with Amato, and she testified she had circled a photograph of the man who was wearing the towel and a photograph of the second man. Ladonna testified that she also identified the same two men at a grand jury proceeding in January 2010.

¶ 12      Duane Thompson, also known as Antwon[2], testified that on June 23, 2002, he went to a vacant lot near 5039 West Madison with his girlfriend and some relatives and friends. Antwon and his girlfriend stayed in the lot while others, including Muhammad, went to the nearby club. Muhammad later returned and the group began to leave. While Antwon was changing the radio station, he heard 8 to 10 gunshots. A man came up to the side of the car about two feet away. Antwon also stated that this man raised his arm and was about seven or eight feet away. He could not remember what the man was wearing. He pulled his girlfriend down. Muhammad said she had been hit and fell inside the passenger's side of the car. Antwon drove to the hospital. Antwon did not talk to the detectives until 2008, at which time he did not make any identifications and stated that the man who raised his arm was wearing a white shirt.

---

[2] Duane (or Antwon) Thompson shares the same last name as another witness, so we will refer to him by his first name.

¶ 13        Taryn Cephas, who was Antwon's girlfriend in 2002, testified that on June 23, 2002, she drove to the area around Madison Street and Lavergne with her boyfriend, Muhammad, and others. Some people went to a club while Cephas and Antwon stayed in the parking lot. Cephas was not drinking or smoking. After her friends returned and she got into the car, she heard 8 to 10 gunshots. Cephas was a little startled and saw "someone run past" the passenger side of her car towards the alley. She saw the man's face and she "could reach out and touch" him. Cephas ducked down, and when she looked back up, she saw the man about 60 to 70 feet away. The man pointed the gun towards the crowd in the lot and stopped. Asked whether she heard anything at that point, she responded, "[W]ell, I'm assuming it was like one shot. I was kind of nervous because I seen—I mean, to see somebody, like, pointing a gun." The State then asked her, "As you saw him pointing the gun, you heard at least four gunshots?" She responded, "Yes." She testified that she could see the man's face. After the gunshots, she did not see where the man went. Cephas testified that the man with the gun had a white cloth wrapped around his face that went from the top of his head to the side of his face and under his chin. She was not sure if it was a shirt or a towel, and the cloth did not obstruct the man's face, which she had never seen before. She did not notice any other shooters and did not see who fired all the gunshots other than man who ran by her truck. Cephas's head was down when most of the gunshots went off. In July 2008, she met with Detective Amato where she identified the "shooter" in a photo array. She did not remember telling the detectives that "the person that was running by the car was five-eight, five-ten, slim, medium skin, had a fade and a white T-shirt." At a grand jury proceeding in August 2010, Cephas identified the same man as the shooter that she had identified with Detective Amato.

¶ 14     On cross-examination, Cephas testified that before she heard the gunshots, she did not see the man who fired the shots, and it was not until after she heard a shot that she became aware of someone. Asked whether, "From the time that you hear the shots, because you say you didn't really see who was shooting, right?" She responded, "Correct." Cephas testified that the man who ran past her car was "sprinting" and it "wasn't like a fast run, though." When she spoke to the detectives in 2008, she told them that the person who ran past her car had a cloth wrapped around his head.

¶ 15     Muhammad testified that on June 23, 2002, she went to a nightclub with some friends. When she left, many people were outside. As Muhammad entered the passenger's side of her friend Antwon's truck, she "felt a burning sensation" in her hip and realized she had been shot. She did not see the person who shot her.

¶ 16     Derrick Jackson testified that he had two previous felony convictions for possession of a controlled substance and possession of a stolen motor vehicle. He was in custody because he did not show up for a court date in this case. On June 23, 2002, Jackson was in the area of Madison and Lavergne to buy coffee from a McDonald's. While walking on Madison, he started talking with some people he knew from the neighborhood. He heard the voice of someone he knew as TY, who he identified in court as Smith. Smith was standing in the street by the passenger's side of a blue Yukon. Smith said something about money, a girl yelled, and Jackson heard six or seven gunshots. Jackson looked across the street and saw "[Smith] standing, holding a gun, and I seen fire jumping from the gun, because it was early in the hour. I seen fire jumping from a gun and I'm steady hearing shots, and at the time I just froze." Smith was with "Country," who he identified as Terrance Freeman. Both men were wearing "something dark" and Smith had a bald head. He did not see Smith with a towel around his head and Smith had a gun in his

hand. He did not see Freeman until after the gunshots when Freeman came around the driver's front end of the Yukon and Smith said something about money. Freeman said to Smith, "[C]ome on, let's go" while the girl fell. Someone ran around a Yukon truck that Jackson knew was Smith's and the Yukon took off westbound. Jackson testified that then he saw "somebody running through the lot, and everybody else running this way, that way, through the lot and everybody running all sorts of way." Jackson did not see who got in the truck or who ran to the alley. Jackson stated that "I used to be on the block with [Smith], so I knew him prior to the incident. I personally know, that's how I recognized his voice in the crowd of everybody talking. I knew his voice because I used to hang with him. I knew him personally." Jackson testified that in February 2008, Detective Amato showed him photographs at the police station and Jackson identified Smith and Freeman in photo arrays. In June 2010, he again identified Smith and Freeman in the same arrays.

¶ 17     On cross-examination, Jackson acknowledged he had prior convictions for manufacture or delivery of heroin and possession with intent to deliver heroin. Counsel asked whether Jackson was a drug dealer and he responded, "Back in those days, yes, I was. *** I sold drugs with those guys, with TY." Jackson also stated that Monroe was Smith's area and Jackson "sold drugs over there for him." Jackson stated that he believed Freeman fired the gun. Counsel asked, "You believe so or you know so?" and Jackson responded, "Right now I'm scared. I believe [Freeman] was the one firing the gun." Jackson affirmed that he saw Smith fire a black gun, as he saw "black fire jumping from the black gun." Jackson did not see Freeman with a gun. Counsel asked how Freeman could have shot a gun if he did not have a gun, and Jackson responded that Smith was the shooter, not Freeman. Jackson agreed that he was mistaken or confused when he previously said Freeman was the one shooting.

¶ 18    Jackson further testified during cross-examination that during a 2003 arrest for attempted robbery, detectives asked him what he knew about this case. Asked at trial whether he told the detectives that Freeman fired at a girl on the sidewalk, Jackson responded, "If that's what they—if that's what's there. I do not remember." Asked if he remembered whether he told the detectives that Freeman "shot another female in the head on the street," Jackson stated, "I remember having a conversation with them about what happened, but I do not remember the details of what I told them." In March 2008, Jackson told Detective Amato that he saw Freeman "firing the gun at the female standing on the sidewalk north of lot" and that Freeman "had shot the female standing near the street." He did not remember telling the detectives that both men fled in an SUV.

¶ 19    Jackson also testified about his previous grand jury testimony. He acknowledged that he had testified at the grand jury proceeding that "I don't remember at this time who was doing the shooting, but it was two guys there." He acknowledged that he testified that one of the men was yelling "about 'you owe me money; or 'that's my money,' something like that" and that he testified that he did not recall which one of them was yelling.

¶ 20    On re-direct, the State asked if Jackson was "scared and nervous here today, correct?" Jackson stated, "Yes." Defense counsel objected based on "mistat[ing] the evidence." The court overruled the objection, noting "[t]hat's what I heard." Jackson then testified that he was scared and nervous.

¶ 21    Patrick Bray, who was currently incarcerated and serving a 25-year sentence for a 2006 drug conspiracy conviction, testified that he owned a record store with Smith from 2001 to 2002 and had known him since 1988-89. He also knew Freeman, who was Smith's cousin. Bray and Smith were both in the Mafia Insane Vice Lords gang. Bray was a five star universal, which

was a very high rank.[3] Smith was a three star universal, which was also a high rank. Bray and Smith sold drugs and Smith worked for Bray. Smith testified against Bray in Bray's drug conspiracy case, but that was not why he was testifying against Smith.

¶ 22       Bray further testified that he learned about the shooting after Smith left him a voicemail during the early morning hours of June 23, 2002, stating that he wanted to talk as soon as possible. Bray and Smith met each other in person that morning near the record store they used to own together. Smith told him that he "[g]ot into it with guys over some women," "[w]e came back and shot the place up," and he had gone back to the area with Freeman. Smith told him this "[b]ecause it was my area and I was in charge of the area" and as a five star universal, Smith had to report it to Bray "[j]ust in case somebody retaliates, or he gets into legal issues, and we have to look out for him." Bray told Smith to "lay low for a while, see what happens," which meant "[d]on't come around, just stay out of sight" of the police, as it was bad for business to have too much police presence. Smith told him that the incident happened on Madison. Bray knew the area, but did not hang out there. Smith controlled Monroe Street.

¶ 23       Bray testified that a few weeks later, a detective told him that "two innocent women [were] killed at that party" and asked him if he knew about it because it was in his area. When he reported this to Smith, Smith told him that the women "must have got in the way." Bray testified he told Smith to "really *** lay low." Smith had to report this type of information to him. In 2011, Bray learned from a newspaper article that Smith had been arrested and told a friend to contact the police. Eventually, Bray spoke with detectives Amato and Fuller, and identified Smith as the person who made the statements about the shooting to him. At a June 2011 grand

---

[3] The references to "rank" were mentioned in Bray's and Smith's testimony but it was never defined.

jury proceeding, Bray again identified Smith as the person who made the statements about the shooting to him.

¶ 24    On cross-examination, Bray testified he was a five star universal for the Mafia Insane Vice Lords and in 2002, Smith was a three star universal. When counsel asked Bray where Bray was when Smith was promoted to a five star in 2000, Bray responded that he did not know anything about Smith being a five star. Smith reported to Bray, and Bray reported to an individual named Troy Martin. Counsel asked Bray whether it was true that in 2000, Smith was only collecting and not controlling anything. Bray responded, "He was running the spot." Counsel asked, "He was collecting street tax. Do you remember that?" Bray responded, "No." Counsel then asked, "[T]hen you must not also remember that you actually collected the street tax for him when he went to school. Do you remember that?" Bray responded that he did not remember.

¶ 25    Bray further acknowledged that he was charged with drug conspiracy in 2004. Bray affirmed that there were a lot of drugs and 48 defendants involved in that case. The defendants included Bray, Smith, and Martin. Smith testified against Bray and Martin in September 2006. Based on Smith's testimony, he and Martin were both convicted, with Bray receiving a sentence of 25 years in prison. Asked whether it was "you or Troy Martin who ordered the hit on Tyris in 2006?" Bray responded, "Neither one of us." Asked whether "[a]s a matter of fact, there were two attempts on Tyris' life. You know that, right?" he responded, "No." When he met with Smith after the shooting, Smith was driving a blue Tahoe, and Bray did not see a cut around Smith's neck or chin area. Smith was bald in 2002.

¶ 26    On redirect, Bray testified when he told Smith to lay low and did not call the police, he was protecting Smith. However, "[a]fter all those years I was protecting him, I feel like after he testified against me that I didn't have any motive to protect him anymore."

¶ 27    Detective Amato testified that after he was assigned to the shooting, he and his partners displayed photo arrays to Jackson in February 2008. Jackson identified Smith and Freeman as being involved in the shooting. Detective Amato went to Muhammad's home, but did not display a photo array because she was "facing in the opposite direction, and she was unable to identify anyone that she did not get a look at." Amato also displayed photo arrays to Ladonna, who identified Smith and Freeman as the two men she saw enter the alley with guns and proceed into the vacant lot. Ladonna told Detective Amato that Smith "had a towel wrapped around his head." In July 2008, Amato interviewed Cephas and showed her two photo arrays, one with Smith and one with Freeman. Cephas identified Smith as the individual she observed running through the lot with a gun in his hand directly past her car. Asked whether Cephas was able to identify a photo of Freeman, Amato responded that she "never a got a look at the second individual."

¶ 28    On cross-examination, Detective Amato testified that Ladonna gave him a description of the "first guy" she saw. Asked whether as part of that description, she told Detective Amato that he "had on short white pants and white gym shoes," Amato responded, "If that's what's contained in the report, that's what she told me." In 2008, Jackson told him that after the shooting, Freeman ran towards Smith and a dark-colored SUV and that they entered the SUV and fled together. Detective Amato testified that Cephas told him in 2008 that she did not get a look at the second shooter. Asked whether it was correct that she told him in the interview that she did not see "a second shooter" and "[s]he didn't even know there was a second shooter?" he

responded that she told him she "saw an individual run past her truck with a gun in his hand." Counsel then asked "[B]ut that doesn't mean you're shooting. She did not see anyone shooting; is that correct" and he responded, "Not that she informed me. Not at that time."

¶ 29    Dr. Brenda Taylor, a dentist, testified that she performed a comprehensive examination on Smith's mouth on July 30, 2013, pursuant to a court order. She noted in her report that Smith was missing 10 teeth and she identified on a chart which teeth were missing. Dr. Taylor did not know which teeth were missing from Smith's mouth in 2002. She would see him in the hallways of the health services almost daily for about six months and she did not notice whether his teeth were missing. Dr. Taylor stated there were no chipped or fractured teeth, and Smith did not have a history of restorative treatment in the top or bottom front teeth.

¶ 30    Dr. Denika Means, an assistant medical examiner at the Cook County Medical Examiner's Office and an expert in forensic pathology, testified she reviewed Richardson's and Tina's autopsies in 2002. Richardson had gunshot wounds to the abdomen and left thigh, and there was no evidence of close range firing. Tina had a gunshot wound to her forehead, and there was no evidence of close range firing.

¶ 31    The parties entered into numerous stipulations including, *inter alia*, that Forensic scientist Marc Pomerance, an expert in firearms, would have concluded that two firearms were involved in the shooting. Six of the eight recovered fired cartridge cases were fired from the same firearm, and the other two were fired from another firearm. Jennifer Barrett, an expert in latent print identification and analysis, would have testified that the recovered cartridge cases did not have any latent impressions suitable for comparison. Tanis Wildhaber, an expert in biology and DNA identification and analysis, would have testified that Robinson's knife did not have any biological material suitable for DNA analysis.

¶ 32                                    Smith's Case

¶ 33        Dr. Jennifer Ron, an expert in the field of emergency medicine, testified that per her examination of Smith, he did not sustain a cut with a knife underneath his chin.

¶ 34        Latina Scott testified that on June 22, 2002, she went to a vacant lot at 5039 West Madison Street with Robinson, Richardson, and another friend. At one point, a "goldish tan" truck with two men inside stopped near them, and the passenger walked over to Scott and her friends. One of his teeth appeared to be chipped. She could see space where a tooth should be. The man handed Robinson, who was dancing, some money, and grabbed her. Robinson tried to get her arm away and pulled out a pocketknife and swung it at him. Scott did not see if the knife cut him. Scott sprayed mace in the man's face, after which he released Robinson. Scott did not recognize anyone who was out there that night. When Detective Amato showed her a photo array in 2008, she did not make an identification. Scott admitted that she was drinking on the night of the shooting and was not in the lot when the shooting happened.

¶ 35        Raveece Sarden[4] testified that she was at the lot the night of the shooting. Before the shooting, Sarden heard a man say, "[C]ome here, come here." Sarden saw a young woman walking fast and heard her say, "[G]et your hands off me." The man grabbed the woman and they argued for two minutes. Sarden turned around and heard one or two gunshots. Sarden looked back toward the woman and saw the same man, who was wearing dark clothes, pointing the gun at the woman. Sarden then heard multiple shots. After the last shot, Sarden looked up and the man was still standing there, after which he got in the front door of a green SUV. Several guys jumped in the side door and the car went straight through the alley. Sarden spoke to officers in 2002 and 2008 and they never showed her any photographs or asked her to identify the person

_____

[4] At the time of trial, the witness' last name was "Sarden," but it was "Landers" in June 2002.

she saw shooting. When she spoke with the police in 2008, she told them that she did not get a good look at the offenders and would be unable to make an identification.

¶ 36     Latresha Penister testified that about midnight on the night of the shooting, she was with friends and relatives at a vacant lot near Madison and Lavergne. At some point, Penister saw a young woman and man arguing. The man pinned the woman against a wall and then about one or two minutes later, Penister heard multiple gunshots. Penister instantly looked in the direction of the gunshots and saw the man shooting the woman. Penister ducked down and did not see the man's face. In 2008, police officers showed Penister a photo array and she did not identify the man she saw shooting.

¶ 37     Ricardo Mayfield testified that he was currently incarcerated for recklessly endangering safety and theft greater than $10,000, and taking and driving a car without consent. He also had prior convictions for aggravated fleeing and eluding and possession of a stolen motor vehicle. On June 23, 2002, at about 5 a.m., Mayfield and a friend, Steven Brown, were in a car parked in front of the vacant lot. Mayfield was "rolling weed" and Brown was smoking marijuana. At some point, Mayfield noticed that a 1999 burgundy GMC Denali SUV pulled up in the alley. The driver got out and threw a towel on his head. Mayfield heard someone say, "Where's the money? Where's that money?" and a gunshot went off. Richardson, who was holding her stomach, walked towards Mayfield, and the man who had the towel on his head was standing behind her. The man "kept shooting her in the back." Richardson fell to the ground and the man started shooting at a car in the street. The man ran towards the alley and jumped in the back of the SUV, which drove off.

¶ 38     After the shooting, four men approached him. One of the men "kept saying, yeah, somebody seen what happened." Mayfield testified that one of them "just kept saying it, and he

would not stop looking at me," looked at him for 20 minutes, and kept staring at him. Looking at the man's clothes and shoes, Mayfield realized that this man was the shooter. He was wearing a T-shirt with no sleeves, blue jeans, and brown Timberline boots, but the towel that was on his head was gone. Mayfield "got a look at him, because he couldn't shoot these people with the towel over his eyes. So, I looked him in his face, then; but then, I got a really, really good look when he came back." Asked whether he recognized any of the other four men in the group other than the shooter, he testified that the older one was Levy, who was from the Four Corner Hustler's gang. He further testified that when the shooter was walking towards him, he "wouldn't take his eyes off of us" and he kept "putting me in a down load *** So, I just kept staring at him back." Mayfield did not talk to the police and eventually left with friends. At a traffic stop, Mayfield noticed that the four men were following them.

¶ 39    On December 27, 2002, Mayfield spoke to a detective and an assistant state's attorney about the case. Mayfield told the detectives that the shooter "was a juvenile," between 16 and 19 years old and that he "got a really, really, really good look at him, because he came back on scene after he did it." Counsel then asked him, "Did you identify what gang he may have been in?" Mayfield responded that he thought the shooter was a Four Corner Hustler named Body Snatcher because he was with Levy. Mayfield stated that the shooter was 5'10" or 5'9" and had braids. On September 19, 2008, Mayfield spoke with detectives Amato and Fuller, who showed him photo arrays. Mayfield did not identify the shooter. He tried to explain that the shooter was young, but the detectives told him "they don't do juvenile photos."

¶ 40    Mayfield testified that in 2008, he saw the shooter at a restaurant downtown. Asked again whether he saw the shooter there, he testified "No, I just seen. *** I thought I seen him," but it was nighttime and the shooter had put down a sun visor so that Mayfield could not see his

face. Mayfield testified he did not know anyone by the name of Tyris Smith or TY, but had seen someone named Tyris Smith and did not know him personally. Mayfield identified Smith in court and recalled seeing him at a car wash. Mayfield denied that Smith was the shooter. He had never seen Freeman before, and Freeman was not the shooter either.

¶ 41       On cross-examination, Mayfield admitted to using his brother's driver's license on previous occasions. As for the area where he saw the four men, the State asked Mayfield, "Well that's not a Four Corner Hustler area over there, right?" Mayfield stated, "I'm going to explain it to you. That's Vice Lords, period." The State asked, "So, you left your gang territory, where you're a gang leader, because some guy that you said is a juvenile is looking at you funny?" Mayfield stated, "Not just a juvenile. That dude was a killer." Mayfield testified that he was five star universal of the Vice Lords. The following colloquy then occurred:

"Q. In fact, you have got two tattoos that indicate that you're a Five-Star Universal Vice Lord. Actually, one that's still there; and one that you have covered up, right?

A. Right.

Q. Okay. Is a Five-Star Universal, is that a high-ranking gang member?

A. I'm quite sure it is.

Q. Okay. Can you stand up, and can you show the Jury your tattoos *** that show you are a Five-Star Universal in the Vice Lords?

A. No.

Q. You're refusing to stand up?

MR. MORLEY [ASSISTANT STATE'S ATTORNEY]: Your Honor, I'm asking for—

THE WITNESS: That's irrelevant to this case."

The court then asked Mayfield, "Where are they?" and he responded, "I am not going to show them." The court asked, "Where are they on your body?" He responded it did not matter and he was not "going to show the jury my tattoos." Counsel then asked Mayfield whether the tattoos were on his arms, and he repeated that he was not going to show his tattoos. Counsel asked him again, "Okay. I mean, the tattoos are on your arms? Just for the record, give me a yes or no, are you refusing to refusing to answer my question?" Mayfield responded, "No, I am refusing to show my tattoos." The court then asked if they were on his arms and Mayfield said, "Yes."

¶ 42      Satonya Little testified that during the early morning hours of June 23, 2002, she was in the area around Madison Street. At around 5 or 5:30 a.m., she saw a young man exit the passenger's side of a dark blue "box Chevy" vehicle, with a trunk "made like a box in the back." The vehicle pulled up behind her about 15 feet away and a man got out. The man, who was "average" with a "low haircut," came to the curb about five feet from her. She got a good look at the man's face, and he did not have anything on his head. The man walked up to a woman standing next to Little, placed a gun on her head, and shot her. Another woman started running and the man ran after her and shot her too. Some of the men tried to chase him. Little knew Smith because she grew up across the street from him. She knew Freeman from the area. Neither Smith nor Freeman was the shooter.

¶ 43      On cross-examination, Little stated that she grew up in an area around West Monroe. The State asked her if that was Vice Lord territory, and she responded, "I guess if that's what you want to call it." The State asked, "[B]ack in June of 2002, that was Tyris Smith's territory, right?" Little responded, "He wasn't the biggest out there, but yeah." She did not talk to the police that night or the next day. Her friend, who was Smith's sister, called her a few years before trial and Little told her that Smith was not the shooter. Little did not go to the police.

¶ 44    Yolanda Payne testified that she was at the club near the vacant lot around the time of the shooting with Richardson and Robinson. She saw an altercation between Robinson and a man that resulted in blood gushing from the man's chin. The man was 200 pounds, had "real dark skin," a "low fro" with gray streaks, and a missing tooth. Another man, who was with the man who got cut, was "brown skinned, a real skinny guy with a small head." Later, the two men from the previous incident returned. One of them was still bleeding and had a white towel wrapped around his face and chin. The man and his friend walked up to Richardson, and after a brief exchange, the man without the towel pulled out his gun and shot Richardson. The man with the towel pulled out his gun and said to Richardson, "You know something, you was with them" and shot her as well. The two men then "turned around to the crowd and started shooting at everybody." Payne ran across the street. She did not stay at the scene or talk to the police.

¶ 45    In 2008, police officers showed her some photographs, but she did not recognize anyone in the photographs as having been at the shooting. In one photo array, she identified "TY." Asked how she knew him, she stated "[f]rom a couple of Mafias from off the street." Payne stated that he was not at the scene that night. The fact that she was drinking and smoking marijuana that night did not impact her ability to describe the offenders nor her ability a few days later to tell the detectives what happened. She had never seen the shooters before the incident. If she saw a photograph of the man who had been cut, she would have been able to identify him.

¶ 46    On cross-examination, Payne admitted that she was convicted of misdemeanor theft in 2010. The State asked, "you are saying that you know that TY is a Mafia Insane Vice Lord, is that right?" and she responded, "Yes." She further stated that Freeman was in one of the photo arrays that the detectives showed her, and she knew him "[f]rom other gang members." The State then asked her, "From other gang members, Mafia Insane Vice Lords?" and Payne responded,

"Yes." In November 2014, Payne refused to view another photo array. She told the detective that it would be a waste of her time, she could not remember anything about that night, and she could not identify anyone. However, she stated that she saw the two women get shot that night and she was 100 percent certain that Smith and Freeman were not there.

¶ 47    Essie Searcy, who was Smith's ex-wife, testified that in 2002, Smith was bald and drove a tan Aurora four-door car. On June 22, 2002, at about 7:00 p.m., she and Smith attended a birthday celebration for her aunt at her grandmother's house. At 11 p.m., they went home, got ready for bed, fell asleep watching television, and woke up at 8 a.m. the next morning. Smith was home when she woke up and he never left that night.

¶ 48    On cross-examination, the State asked whether Smith was "a member of the Vice Lords" and Searcy responded, "[i]n his younger days" but that he was not a member in 2002. The State asked whether Smith was "a drug dealer in 2002?" Searcy responded, "Not that I know of." The State also asked her, "[S]o you knew nothing about Tyris in the 2000s selling drugs?" She responded, "I mean no." The State asked if Freeman, who was Smith's cousin, was a Vice Lord, and Searcy responded, "I have no idea." The State further asked, "When did [Smith] quit being a drug dealer?" Searcy stated, "I don't remember the exact date, but once him and I met, then his total life just totally changed." Searcy acknowledged that in October 2006, Smith was stabbed in the eye and needed stitches, and in 2007 he was stabbed in the chest with an ice pick.

¶ 49    Defendant testified that he joined the Mafia Insane Vice Lords in 1991-92 and met Patrick Bray in 1993. In 2000, he was a five-star universal elite, which was the same rank as Bray. He previously had a drug spot, which was a street corner where he would sell drugs. He was "ordered to do something by Troy Martin," the "king of the Mafias." Smith refused, so Martin told him he "couldn't work on the drug spot anymore." Smith was then assigned to

collect "street tax," which he did not always do, as a lot of the time he was at school, working, or refused to do it. In 2000, he worked at a funeral home and started studying mortuary science at Malcolm X College, after which he transferred to two other colleges and then received a degree. In 2004, Smith was charged with drug conspiracy and faced a sentence of 120 months to life in prison. Smith later became a witness in that case and worked with DEA agent Jeff Konvalinka, after which he entered a plea agreement and agreed to serve 120 to 180 months in prison in exchange for providing truthful information as a confidential source. In 2006, Smith testified against Bray and others, and Bray received 25 years in prison. Before Smith was sentenced in that case, he was attacked and cut across his eye and on another occasion, he was stabbed with an ice pick in his chest.

¶ 50      On June 23, 2002, Smith was at home sleeping with Searcy. He was not out near the Madison Street area because she "wasn't having any of that." After Smith got married, the only gang activity he was involved in was collecting tax. He kept his gang activity from Searcy and was attempting to remove himself from it in 2000 because he had a wife and children to take care of. On the date of trial, Smith was no longer a Mafia Insane Vice Lord.

¶ 51      On cross-examination, the State asked "how much time do you have left on your sentence right now?" Smith responded, "It's pretty much done." The State then asked, "So I mean you're almost a free man?" and he responded, "Yes." The State asked "Yolanda Payne, she came in here. She said she knew you as a Mafia Insane Vice Lord. You know her, right?" Smith responded, "I don't even recall seeing her before." In 2002, Martin still considered him a five star universal, but "it didn't mean anything to me." Smith did not know if Freeman was a drug dealer, and he was not a drug dealer for Smith. Asked whether the "Vice Lords dope spots, those things are pretty lucrative, right?", Smith responded, "It depends on like any business, location."

Asked how much he made on a drug spot on Monroe, Smith stated that "It varied." The following colloquy then occurred between the prosecutor and Smith:

"Q. Well, give the jury some numbers, about how it varied?

A. It could be 10,000 week, it could be 30,000 the next week.

Q. And that was your spot?

A. Yes.

Q. So you were making between 10, 30 a week, so split it in the middle, 20 a week, 20,000 a week, right?

A. Give or take, yes.

Q. And how much of that would have to be kicked up to the bosses?

A. Well, if you want to get technical, not all of that was profit.

Q. Okay. How *** much of that would get kicked up to the bosses.

A. Maybe 250 a week.

Q. 250 a week?

A. Yes.

Q. Okay. So when you were doing collection work, how many dope spots—I mean you're a five star universal. How many dope spots did they order you to collect from? I mean were they run running you ragged?

A. No."

¶ 52  Smith testified that he collected about four drug spots a week and the following colloquy occurred:

"Q. So you only had to kick in out of 30,000 a week, you only had to kick up 250 a week?

-22-

A. Like I said, it wasn't all profit.

Q. So when you had your drug /SPHOTS [*sic*], 30,000 went to you, 250 went to the bosses?

A. No, 30,000 didn't go to me. Like I said, it wasn't all profit."

Smith further testified that it could be pretty dangerous life selling drugs. Bray was wrong when he said that Smith was a three-star universal. If someone did not pay when Smith made weekly collections from 2000 to 2006, he informed Martin, who sent "his collection agency." He stopped making collections in 2003. Smith also stated that when he testified against the defendants in the federal case, he had made two or three undercover purchases a week for about four or five months. He made deals for 125 grams of cocaine for $2,500. He agreed that he got his time "cut pretty well." The State asked whether he was able to make the deals for 125 grams because he "had never stopped drug dealing, did you?", and Smith responded, "I stopped."

¶ 53    Detective Peter Vetrano testified that in May 2003, he interviewed Jackson, who stated that "Country fired at girl on the sidewalk. Then pointed a gun at another female on the street and shot her in the head."

¶ 54    DEA Agent Konvalinka testified that Smith was a target in an investigation. In 2006, Konvalinka registered Smith as a confidential source with the DEA and Smith helped by wearing a wire and making drug purchases from drug traffickers and various gangs that were involved in selling large amounts of narcotics in Chicago. A confidential source must follow directions, commit to not committing crimes, and go through a long registration process. In 2006, Konvalinka went to visit Smith in the hospital because Smith was attacked. He did not remember whether Smith had eight stiches above his eye. In 2007, he visited Smith in the hospital because Smith was attacked again. Smith told him he was attacked because he had cooperated with the

DEA. Smith was deactivated in 2007 in good standing. Konvalinka noted that most of his confidential sources come to him because they had committed crimes in the past. Smith came to him because he had committed a crime and was facing a lot of time.

¶ 55       The parties stipulated that Assistant State's Attorney Mark Hitt would testify that on June 17, 2010, he was present during the interview with Jackson, who stated he did not remember "who was doing the shooting, but it was two guys there," and did not remember which man said something about money.

¶ 56       In rebuttal, the State called Detective Amato, who testified that in April 2008, he administered a photo array to Payne, and Payne told him she was unable to identify anyone and "was too drunk and high at the time." She did not tell him that she knew a person by the name of TY or that she knew him from the Mafia Insane Vice Lords. Payne never told him about the initial altercation that took place.

¶ 57       The court entered into evidence a certified conviction from the United States District Court from March 2007 showing that Smith was convicted of conspiracy to possess with intent to distribute a controlled substance, to which he was sentenced to 120 months in prison.

¶ 58                                 Closing Arguments and Jury Verdict

¶ 59       In closing argument, the State argued that "if you actually thought that two women could die over a hundred dollars, over a hundred dollars and some perceived disrespect, well, you didn't get to share the room with the high-ranking Vice Lord." The State further asserted that "[a]nd as you know, and you heard from the evidence *** the girls that maybe took the hundred bucks, the girl that Maced the gang leader, the girl that cut his chin, they weren't even there." The State urged the jury to think about "what [Smith] told you just yesterday, drug spots, collecting taxes, $10,000 to $30,000 a week from a spot. *** [T]here's only one thing that

matters more than the lives of two young ladies and that is money, and that's money that mattered to him. Disrespect, he controlled that block."

¶ 60    Defense counsel argued that this was a case of misidentification and retaliation and that the witnesses provided different descriptions of the shooter. Counsel asserted that the State "tells you he was collecting the tax, not dealing drugs. He was collecting the money, 10 to $30,000 a week. Are you serious? And you really believe that he's handling that kind of money and he's going to get that red faced and hopping mad over one hundred dollars?"

¶ 61    In rebuttal, the State argued that in June 2002, Smith "had more than a hundred dollars, but he was out there a block away from where he ran his dope spot on Monroe." The State asserted that Smith was "the neighborhood dope dealer" and the jury heard Smith say he was "just about done with his sentence" in the case in which he had testified against the other defendants.

¶ 62    After deliberations, the jury found Smith guilty of two counts of first degree murder and found that during the offense, Smith personally discharged a firearm.

¶ 63                     Posttrial Motions and Sentencing

¶ 64    In Smith's posttrial motions, Smith argued that the State's witnesses were inconsistent and that the defense witnesses testified credibly and impeached the State's witnesses. Smith presented tables that summarized the trial testimony regarding what each witness said about the offenders' height, build, complexion, hairstyle, vehicle, towel, and teeth. Smith contended that the court erred in ruling that the gang evidence should be allowed for the purpose of explaining the relationship between Bray and Smith. He asserted that the State violated the court's ruling by introducing gang evidence with several witnesses that did not have anything to do with the conversation and the State improperly elicited gang testimony with

Mayfield, Payne, Searcy, and Smith. Further, the court did not give a limiting instruction to ameliorate any prejudicial effect.

¶ 65    In another posttrial motion, Smith asserted that on January 15, 2016, the United States Attorney filed a motion to reduce Bray's federal sentence, which was based in part on his testimony against Smith. He asserted that the motion noted that "both the principal Assistant State's Attorney overseeing the case and the investigating Chicago Police Detective have indicated that [Bray's] testimony was important in securing Mr. Smith's murder conviction." He contended that the eventual reduction in Bray's sentenced proved the defense theory that Bray was disingenuous and merely cooperating with the State for his own benefit. Smith stated that he could not effectively cross-examine Bray about his bias and motive for testifying without the facts of his cooperation and the benefits he received from it.

¶ 66    The court denied Smith's motions. In its oral ruling, the court noted in part that the jury heard that Smith testified against Bray in the federal drug conspiracy trial, which resulted in Bray's 25-year sentence, and also heard about the alleged attempts on Smith's life, which gave the defense evidence that Bray had a motive to provide false testimony against defendant, a theory the jury rejected. The court noted that other inconsistences and weaknesses in the State's case were all presented or argued to the jury and that the jury rejected the defense theories and arguments. It noted that the jury assessed the evidence and the credibility of the witnesses and found Smith guilty.

¶ 67    The court subsequently sentenced Smith to a term of natural life in prison, with an additional 20 years for personally discharging the firearm during the commission of the offenses. The court denied Smith's motion to reconsider sentence, and he appealed.

¶ 68                                    II. ANALYSIS

¶ 69                                    Identification Testimony

¶ 70        On appeal, Smith contends that the identification evidence was insufficient. He

asserts that the descriptions of the offender given by the State's witnesses did not match his

appearance at the time of the shooting and the identifications were first made six years after the

offense.

¶ 71        When we review a challenge to the sufficiency of the evidence, we must determine

whether, viewing the evidence in the light most favorable to the State, any rational trier of fact

could have found that the State proved the essential elements of the offense beyond a reasonable

doubt. *People v. Macklin,* 2019 IL App (1st) 161165, ¶ 17. All reasonable inferences from the

evidence must be drawn in favor of the State. *People v. Martin,* 2011 IL 109102, ¶ 15. As a

reviewing court, we will not retry the defendant. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228

(2009). We will also not substitute our judgement for that of the trier of fact. *People v. Bannister,*

378 Ill. App. 3d 19, 39 (2009). Further, the jury, as the trier of fact, is responsible for fairly

resolving conflicts in the evidence, weighing the evidence, and drawing reasonable inferences

from basic facts to ultimate facts. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). "Decisions

regarding the credibility of witnesses and the weight given to their testimony are exclusively

within the province of the jury." *People v. Nesbit*, 398 Ill. App. 3d 200, 209 (2010). A reviewing

court will not reverse a conviction "simply because the evidence is contradictory [citation] or

because the defendant claims that a witness was not credible." *Siguenza-Brito*, 235 Ill. 2d at 228.

We will not reverse a conviction on the grounds of insufficient evidence "unless the evidence is

so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's

guilt." *Bannister,* 378 Ill. App. 3d at 39.

¶ 72    To sustain a conviction, "the State must prove the identity of the offender beyond a reasonable doubt." *People v. Stanley,* 397 Ill. App. 3d 598, 610 (2009). The identification of a defendant by a single witness is sufficient to sustain a conviction where the witness viewed the defendant under circumstances that permitted a positive identification. *People v. Slim,* 127 Ill. 2d 302, 307 (1989). "The reliability of a witness's identification of a defendant is a question for the trier of fact." *In re Keith C.,* 378 Ill. App. 3d 252, 258 (2007). In assessing identification testimony, we consider the five factors set forth by our supreme court in *Neil v. Biggers*, 409 U.S. 188 (1972): "(1) the witness's opportunity to view the defendant during the offense; (2) the witness's degree of attention at the time of the offense; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty at the subsequent identification; and (5) the length of time between the crime and the identification." *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 47. When the jury weighs identification testimony, the jury "should consider all the factors together instead of one factor as an alternative to another factor." *People v. Smith,* 2012 IL App (4th) 100901, ¶ 87.

¶ 73    Here, viewed in the light most favorable to the State, we find that the evidence was sufficient to support the jury's finding that Smith was the offender beyond a reasonable doubt. The record shows that the State's witnesses, Ladonna, Cephas, and Jackson, observed Smith at the scene and identified him in 2008, so we will focus on these witnesses. All of the *Biggers* factors weigh in favor of the State.

¶ 74    As for the first and second factors, the witnesses' opportunity to view Smith during the offense and their degree of attention at the time of the offense, these factors favor the State. The record shows that Cephas, Ladonna, and Jackson had sufficient opportunity to observe Smith during the offense and they provided detailed accounts of how their attention was focused

on him when he ran past them. Cephas testified that after she heard the gunshots, she saw someone run past her car towards the alley. She could see his face and was close enough to "reach out and touch" him. He had a white cloth wrapped around his face that did not obstruct his face. When she looked back up, she saw the same person closer to the alley about 60 to 70 feet away pointing a gun towards the crowd, after which she heard gunshots. Ladonna testified that it was daylight, the streetlights were on, and she had a "nice good glance" at the men, who both had guns and were jogging past her car. The man who was wearing a white towel around his head was shorter than the other man, she got a good look at his face, and he looked in the direction of her van. Smith asserts that Cephas and Ladonna saw the offender "very briefly." However, a credible identification can occur even where a witness has observed the offender for just 5 to 10 seconds (see *People v. Reed*, 80 Ill. App. 3d 771, 777-78 (1980)) and it is a factor for the trier of fact to consider in weighing the testimony (*People v. Petermon*, 2014 IL App (1st) 113536, ¶ 32). As for Jackson, who knew Smith personally before the shooting, he testified he heard Smith say something about money and then saw him "standing, holding a gun," after which he saw "fire jumping from the gun" and heard gunshots. There was no evidence showing that the stress of the shooting affected the witnesses' ability to see Smith or their degree of attention to the incident. See *In re J.J,* 2016 IL App (1st) 160379, ¶ 30 (noting that the victim's testimony indicated that fear might have affected her judgment, but that her "testimony was also detailed and descriptive and indicated that she was acutely aware of what was happening during the encounter"). Considering all of this evidence, the witnesses had sufficient opportunities to view Smith during the shooting and they had a sufficient degree of attention on him such that they could identify him.

¶ 75    With respect to the third factor, the accuracy of the witnesses' prior descriptions of the defendant, this factor favors the State. Jackson testified that he knew Smith personally before the shooting and used to hang out with him. He testified that in 2008 he identified Smith in a photo array as being involved in the shooting, and he identified Smith at trial. Cephas testified that the man with the gun had a cloth wrapped around his face and when she spoke to Detective Amato in 2008, she told him that the man who ran past her car had a cloth wrapped around his head. Ladonna testified that one of the men who ran past her with a gun had a towel wrapped around his head, the towel had a little blood on it, and in 2008 when she spoke to Detective Amato, she circled the man who was wearing the towel. Cephas and Ladonna separately identified Smith in a photo array in 2008 and each identified him as having worn a towel around his head, thus corroborating each other's testimony. Smith asserts that Jackson testified that he did not have a towel wrapped around the head, which contradicted Cephas's and Ladonna's testimonies. However, the jury heard this testimony, and it is "the jury's responsibility to resolve factual disputes and assess the credibility of witnesses." *People v. Miles*, 2020 IL App (1st) 171258, ¶ 32.

¶ 76    To the extent that Smith is arguing that the witnesses' prior descriptions were too general, the courts have repeatedly held that "identification testimony which fails to mention notable physical characteristics of the defendant may nonetheless prove a defendant's guilt beyond a reasonable doubt." *People v. Barnes*, 364 Ill. App. 3d 888, 894 (2006). We cannot find that any lack of detail of the State's witnesses' descriptions rendered their testimony insufficient, especially where, as previously discussed, they had ample opportunity to view Smith during the offense.

¶ 77        With respect to the fourth factor, the witnesses' level of certainty at the subsequent identification, Cephas and Ladonna positively identified Smith in photo arrays in 2008. Amato testified that in 2008, Cephas identified Smith as the individual she observed running through the lot with a gun in his hand directly past her car and Ladonna identified Smith as one of the two men she saw enter the alley with a gun and proceed into the vacant lot. Further, at trial, Cephas identified the photo array in which she identified the "shooter" to Detective Amato, and she indicated where in that array she had identified the shooter. Similarly, Ladonna identified the photo array that Detective Amato showed her in 2008, and she indicated where in that array she identified the man with the towel. The court admitted into evidence copies of the photo arrays showing where the witnesses marked Smith's photo. As for Jackson, who identified Smith at trial, he knew Smith personally before the shooting and Detective Amato testified that Jackson identified Smith in a photo array in 2008 as being involved in the shooting. The record does not show that the witnesses expressed any uncertainty or wavered at any time when they made their identifications. See *People v. Green*, 2017 IL App (1st) 152513, ¶ 112 (where the eyewitness identified the defendant three months after the shooting and then again a little less than two years later, the court noted that the eyewitness never wavered in his degree of certainty that the defendant was the shooter).

¶ 78        As for the fifth factor, the time between the offense and the witnesses' identifications, here, neither Cephas, Ladonna, nor Jackson identified Smith until 2008. However, "the lapse of time goes only to the weight of the testimony, a question for the jury, and does not destroy the witness's credibility." *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972). Further, the witnesses' delay in identifying Smith was fully examined on cross-examination, so the jury had the opportunity to weigh the evidence. See *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 166

(noting that the "witnesses' delay in identification and their ability to view were explored by defense counsel on cross-examination and the jury was able to weigh their answers").

¶ 79 Further, Bray's testimony about his conversation with Smith, in which Smith made statements admitting his involvement in the shooting, corroborated the identification testimony of Jackson, Cephas, and Ladonna. In addition, as previously discussed, "the testimony of a single witness, if positive and credible, is sufficient to convict." *Siguenza-Brito*, 235 Ill. 2d at 228. Here, Jackson testified that he personally knew Smith, used to hang out with him, and before the shooting, he heard Smith's voice, and then looked over and saw Smith "standing, holding a gun" and "firing jumping from a gun," after which he heard shots. This testimony was sufficient to convict Smith.

¶ 80 Smith asserts that Jackson's testimony was inconsistent and unreliable. He states that Jackson testified he told the detectives in 2008 that he saw Freeman shooting at a woman standing on the sidewalk. He cites the 2010 grand jury proceeding where Jackson stated he did not remember who was doing the shooting. However, "[v]ariances between a witness' trial testimony and pretrial statements raise questions of credibility which the trier of fact must assess in making a determination of guilt." *Slim*, 127 Ill. 2d at 308. Smith also asserts that Jackson's testimony is unreliable because he first testified that Freeman was the shooter and then testified that Freeman was not the shooter. During cross-examination, Jackson testified that he believed Freeman fired the gun. Defense counsel asked whether he knew so or believed so. Jackson stated, "Right now I'm scared. I believe [Freeman] was the one firing the gun" and he agreed he was mistaken or confused when he previously said that Freeman was the one shooting. Jackson also testified he was scared and nervous. We acknowledge this inconsistency with Jackson's testimony. However, as previously discussed, it was the jury's role to determine Jackson's

credibility, weigh the evidence, and resolve any inconsistencies. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 56 ("Credibility is generally an issue for the jury, not the appeals court *** [and] the jurors were in a far better position to determine and weigh credibility, since they viewed and heard the witnesses first-hand, whereas a reviewing court has only a cold, inert transcript on which to rely"). Further, "even contradictory testimony does not destroy the credibility of a witnesses" and the trier of fact was responsible for determining how flaws in part of the testimony affected the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47.

¶ 81    Lastly, as previously discussed, the reliability of witness identifications is for the trier of fact to determine. Here, the case involved multiple witnesses testifying about their version of the offense and the offender(s). The testimony and inconsistencies between the witnesses' descriptions regarding the offense and Smith, including, *inter alia*, the type of vehicle he drove, type of hair, and his mouth, were fully examined at trial. It was the jury's responsibility as the trier of fact to determine the witnesses' credibility, the weight to be given to their testimony, and to resolve any inconsistencies and conflicts in the evidence. *People v. Starks*, 2014 IL App (1st) 121169, ¶ 51. That one witness's testimony contradicts another witness does not mean each witness's testimony is not credible, as the trier of fact may accept or reject as much or as little of a witness's testimony as it chooses. *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67. The jury's guilty finding indicates that it resolved any inconsistencies in favor of the State, and we will not substitute or judgment for that the fact finder.

¶ 82    Accordingly, after viewing the evidence in the light most favorable to the State and weighing the *Biggers* factors, we conclude that a rational trier of fact could have found that the witnesses' identifications were sufficiently reliable to prove Smith guilty beyond a reasonable doubt.

¶ 83                                       Gang Evidence

¶ 84        Smith next contends that the State went beyond the trial court's pretrial ruling that

allowed for the introduction of gang membership evidence for the sole purpose of establishing

the context of statements Smith made to Bray. Smith argues that the State severely prejudiced his

right to a fair trial by introducing highly prejudicial testimony that had no purpose other than to

inflame the jury. The State responds that the evidence Smith challenges was largely cumulative

of evidence that was properly admitted, and Smith used gang evidence in his case as an essential

part of his defense.

¶ 85        Smith specifically takes issue with gang evidence testimony that was elicited during

the State's cross-examination of Mayfield, Payne, Searcy, and Smith. Defense counsel did not

object at trial to the gang-related evidence that was elicited during their testimonies. However,

before trial, Smith filed a response objecting to the State's pretrial motion to introduce gang

evidence and filed a *motion in limine* to bar the State from introducing gang evidence. Smith also

included the issue in his posttrial motion. Thus, Smith preserved his claim for review. See *People

v. Denson*, 2014 IL 116231, ¶ 18 ("In criminal cases, this court has held consistently that, to

preserve an issue for review, a defendant must raise it in *either* a motion *in limine* or an objection

at trial, *and* in a posttrial motion"). (Emphasis in original.)

¶ 86        "Although gangs are regarded with considerable suspicion, gang-related evidence

need not be excluded if it is otherwise relevant and admissible." *People v. Resendez*, 273 Ill.

App. 3d 751, 757-58 (1995). Gang evidence "may be admitted so long as it is relevant to an issue

in dispute and its probative value is not substantially outweighed by its prejudicial effect."

*People v. Johnson*, 208 Ill. 2d 53, 102, (2003). Further, "[e]vidence of gang affiliation is relevant

if it tends to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." *Id.* "[A] defendant may not insulate the fact finder from the fact of his gang membership, despite prejudice toward it, if that fact is relevant to understanding the case." *People v. Colon*, 2018 IL App (1st) 160120, ¶ 34. "Evidence of gang membership is admissible only when there is sufficient proof that membership is related to the crime charged." *Johnson*, 208 Ill. 2d at 102. We review a trial court's evidentiary rulings with respect to gang-related evidence for an abuse of discretion. *Id.*

¶ 87        Smith takes issue with certain portions of the State's cross-examination of Payne, Searcy, and Smith regarding Smith and Freeman's membership in a gang. Applying the principles stated above and viewing the testimony and record as a whole, we disagree with Smith that the State's use of gang evidence violated the trial court's pretrial ruling and denied him a fair trial. As previously discussed, the trial court granted the State's pretrial motion that requested that gang evidence be admitted through Bray to explain the circumstances surrounding the conversations that took place between Smith and Bray after the shooting. The court stated that the "jury should know all the circumstances" under which Smith's alleged statements were made to Bray and it was necessary for the jury to "determine whether the statements were made" and "if so, what weight should be given to the statements, if any." The court concluded that "[t]he minimal amount of gang evidence is highly relevant to the circumstances surrounding the alleged statement of the defendant and more probative to the issue than prejudicial to the defendant." Smith "concedes that the initial ruling by the Court was correct, in allowing the context of Mr. Bray's alleged conversation with Mr. Smith to be explained." Smith contends that the State's questions exceeded the bounds of that ruling.

¶ 88        Through Bray's testimony, the jury heard about Smith's and Bray's gang membership and ranks. Bray testified that he and Smith were both in the Mafia Insane Vice Lords gang, Bray

was a five star universal, which was a very high rank, and Smith was a three star universal. He testified that Smith made the statements to him about the shooting "[b]ecause it was my area and I was in charge of the area" and as a five star universal, Smith had to report it to Bray. Then, during defense counsel's cross-examination, counsel challenged Bray about Smith's rank, "Where were you in 2000 when he got promoted to a five star?" Bray stated that he did not know anything about Smith being a five star. Further, defense counsel questioned Bray about the federal case in which Smith testified against him and he agreed that he was convicted based upon Smith's testimony. Counsel then asked him whether he had "ordered the hit" on Smith in 2006. The record shows that defense counsel used the testimony about Smith's and Bray's ranks and the federal drug case to challenge Bray's testimony and credibility.

¶ 89    Smith also introduced gang-related evidence during his testimony to support his defense and further challenge Bray's credibility. On direct examination, Smith testified that he joined the Mafia Insane Vice Lords in 1991-92, and in 2000, he was a five-star universal elite, which was the same rank as Bray. He testified that he lost his drug spot in 2000 because he refused an order, after which he was assigned to collect "street tax," the only gang activity he was involved in after he got married. Smith testified that he testified against Bray and others in 2006 and that before he was sentenced in that case, he was attacked twice. Smith also presented DEA agent Konvalinka, who testified about the two attacks on Smith.

¶ 90    The jury heard about Smith's gang affiliation during not only Bray's testimony, but also his own testimony, where he volunteered gang-related evidence to support his defense. See *People v. Harris*, 231 Ill. 2d 582, 588 (2008) ("There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible."); *Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374 (1990) ("where a party

himself introduces or elicits certain evidence, he cannot later complain"). Thus, we cannot find that State violated the pretrial ruling during the cross-examinations of Payne, Searcy, and Smith or that he was denied a fair trial. Further, as previously discussed, defense counsel did not object during these witnesses' testimonies, and Smith acknowledges on appeal that there was a "certain amount of truth" to the State's posttrial argument that defense counsel "opened the door to the State's introduction of gang-evidence."

¶ 91    Smith also takes issue with the State's questions during Mayfield's cross-examination about his gang affiliation, rank, and territory. Smith asserts that Mayfield "never said the shooter was in a gang," and there was "no reason to bring any of this up." Smith asserts that the State improperly asked about Mayfield's alleged tattoo.

¶ 92    On direct examination, Mayfield testified about his opinion about whether the shooter was in a gang. Asked whether he recognized any of the other four men in the group other than the shooter, he testified that the older one was "Levy," who was from the Four Corner Hustler's gang. He testified that on December 27, 2002, he told the detectives that the shooter "was a juvenile" and that he "got a really, really, really good look at him, because he came back on scene after he did it." Defense counsel then asked, "Did you identify what gang he may have been in?" Mayfield responded that he thought the shooter was a Four Corner Hustler named Body Snatcher because he was with Levy. Given that Mayfield testified that he believed the shooter was in a different gang, the State's questions regarding his gang affiliation were relevant to the issues of bias and credibility. See *People v. Blue*, 205 Ill. 2d 1, 15 (2001) (evidence of gang affiliation can be sufficiently probative of bias to warrant its admission on cross-examination); *People v. Gonzalez*, 104 Ill. 2d 332, 337 (1984) (the widest latitude should be given the defense on cross-examination when trying to establish a witness's bias or motive).

¶ 93     The State's questions during Mayfield's cross-examination about his tattoos were irrelevant. Nevertheless, viewing the record as whole, including that the jury heard Bray's testimony about Smith's gang membership to explain the context of their conversation, and Smith himself introduced evidence regarding gang affiliation, we cannot find that the evidence regarding Mayfield's tattoos was significant enough to prejudice Smith or that the outcome would have been different had the evidence been excluded. See *People v. Brown*, 2014 IL App (2d) 121167, ¶ 28 (improper admission of evidence is harmless where there is no reasonable probability that, if the evidence had been excluded, the outcome would have been different). Any error in the State's references to and questions about Mayfield's tattoos during his cross-examination was harmless.

¶ 94     Smith also contends that the State went beyond the trial court's pretrial ruling during its closing argument when it stated "if you actually thought that two women could die over a hundred dollars, over a hundred dollars and some perceived disrespect, well, you didn't get to share the room with the high-ranking Vice Lord" and "you heard from the evidence *** the girls that maybe took the hundred bucks, the girl that Maced the gang leader, the girl that cut his chin, they weren't even there." Smith argues that the State's remarks added nothing to the context of the conversation between him and Bray. Smith asserts that the State's comments pursued the theory that the incident started because he felt "disrespected, not as a man, but as a 'high-ranking Vice Lord gang' member." Smith argues there was no reason to refer to him in this manner other than to inflame the jury.

¶ 95     Smith forfeited his argument regarding the State's remarks because he failed to object at trial and did not include the issue in his posttrial motion. See *People v. Henderson,* 2016 IL App (1st) 142259, ¶ 238 (to preserve a claim regarding improper statements made during closing

argument, a defendant must object to the statements both at trial and in a written posttrial motion). Nevertheless, Smith correctly states for the first time in his reply brief that we may review the issue under the plain error doctrine. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) ("although defendant did not argue plain error in his opening brief, he has argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error"). Under the plain error doctrine, we will review unpreserved error if "a clear or obvious error" occurred and either the evidence is "closely balanced" or the error is "so serious that it affected the fairness of the defendant's trial." *People v. Johnson*, 385 Ill. App. 3d 585, 604 (2008) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)). The first step in plain-error analysis is to determine whether a clear or obvious error occurred. *Ramsey*, 239 Ill. 2d at 412. We find that no clear or obvious error occurred here.

¶ 96        "[A] prosecutor is allowed a great deal of latitude in closing argument and has the right to comment upon the evidence presented and upon reasonable inferences arising therefrom, even if such inferences are unfavorable to the defendant." *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26. "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses." *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Even if a prosecutor's remarks were inappropriate, "reversal is required only if they engendered substantial prejudice against the defendant such that it is impossible to tell whether the verdict of guilt resulted from them." *People v. Guerrero*, 2020 IL App (1st) 1721456, ¶ 10. "Substantial prejudice occurs 'if the improper remarks constituted a material factor in a defendant's conviction.' " *Henderson*, 2016 IL App (1st) 142259, ¶ 238 (quoting *People v. Wheeler*, 226 Ill. 2d 98, 123 (2007)). It is a

substantial burden for a defendant to achieve reversal of their conviction based upon improper remarks made during closing argument. *People v. Green*, 2017 IL App (1st) 152513, ¶ 77. "When reviewing claims of prosecutorial misconduct in closing argument, a reviewing court will consider the entire closing arguments of both the prosecutor and the defense attorney, in order to place the remarks in context." *People v. Dixon*, 378 Ill. App. 3d 535, 551 (2007).

¶ 97 From our review of the entire closing arguments, we cannot find that the State's remarks were improper or resulted in substantial prejudice to Smith. The remarks were based on the evidence presented at trial and on the reasonable inferences arising therefrom. As previously discussed, the jury heard through Bray's and Smith's testimony about their gang membership and ranks. The jury also heard defense counsel's theory that this case was in part about misidentification and retaliation, including the questions to Bray about Smith being the same rank as Bray, Smith testifying against Bray in the federal case in 2006, and whether Bray had "ordered the hit" on Smith in 2006. The State's comments and references to Smith's gang affiliation and rank in closing arguments were reasonable inferences based on the evidence and were not improper. Thus, because there was no error, there is no plain error.

¶ 98 However, even if the State's comments were improper, the error was corrected by proper jury instructions. See *Green*, 2017 IL App (1st) 152513, ¶ 98. "A trial court's instructions that closing arguments are not evidence protect defendant against any prejudice caused by improper comments made during closing arguments." *Id.* We presume the "jurors follow the instructions provided by the trial court." *Id.*

¶ 99 Here, before closing arguments, the court instructed the jury as follows:

"As I've told you before, what the attorneys say in closing argument is not evidence.

It is merely what they believe the evidence has shown. The arguments of the attorneys

should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Any argument that you hear that you feel is not supported by the facts, you should disregard that argument."

Following closing arguments, the court instructed the jury as follows:

"Closing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

The court instructed the jury that the State's comments were not evidence and to disregard anything they heard that was not based on the evidence. Thus, even if the State's comments were improper, the court corrected any error by instructing the jury. See *id.* ¶ 99 ("Even if the State's comments at closing argument were improper, the trial court corrected any error by instructing the jury that the State's comments were not evidence and to disregard anything they heard that conflicted with the evidence presented at trial.").

¶ 100                                    Drug Evidence

¶ 101        Smith contends that the State's repeated references to his involvement in drug dealing presented prior bad act evidence to the jury and prejudiced his right to a fair trial. He asserts that the State repeatedly commented on his involvement in drug trafficking and the size of the operation and that these prior bad acts had nothing to do with this case and only served to inflame the jury and deny him a right to a fair trial. Smith takes issue with certain portions of the State's cross-examination of Smith regarding his drug involvement. The State responds that its cross-examination was a direct result of Smith's testimony about his previous drug sales.

¶ 102    "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). Such evidence is *per se* inadmissible to prove a defendant's propensity to commit crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, it is well settled that "evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes." *People v. Chapman*, 2012 IL 111896, ¶ 19. Such purposes include motive, intent, identity, lack of mistake and *modus operandi*. *Id*. Further, "[i]f evidence of other crimes is intertwined with the charged offense, such evidence may be admissible." *People v. Evans,* 373 Ill. App. 3d 948, 958 (2007). However, "[e]ven when such evidence is offered for a permissible purpose and not solely for propensity, such evidence will not be admitted if its prejudicial impact substantially outweighs its probative value." *Chapman,* 2012 IL 111896, ¶ 19. The admissibility of evidence is within the sound discretion of the trial court, and we will not overturn that decision absent a clear abuse of discretion. *Evans*, 373 Ill. App. 3d at 959.

¶ 103    Defense counsel did not object at trial during the State's cross-examination of Smith about his drug activity. To preserve an issue for review, a defendant must both raise an objection at trial and raise the issue in a posttrial motion. *People v. Enoch,* 122 Ill. 2d 176, 186 (1988). Smith states for the first time in his reply brief that we should review the issue under the plain error doctrine. As previously stated, Smith raised plain error in his reply brief, which is sufficient to allow us to review the issue under the plain error doctrine. See *Ramsey*, 239 Ill. 2d at 412. The first step in the plain error doctrine is to determine whether "a clear or obvious error" occurred. *Johnson*, 385 Ill. App. 3d at 604. From our review of the testimony as whole, we find that no error occurred.

¶ 104    It is well-established that "a defendant can open the door to the admission of evidence

that, under ordinary circumstances, would be inadmissible." *People v. Harris*, 231 Ill. 2d 582,

588-89 (2008). Further, "when a defendant procures, invites, or acquiesces in the admission of

evidence, even though the evidence is improper, [he] cannot contest the admission on appeal."

*People v. Bush*, 214 Ill. 2d 318, 332-33 (2005).

¶ 105    Here, Smith presented evidence regarding his drug involvement during his own

testimony. Among other topics, he testified about when he first joined the Mafia Insane Vice

Lords and discussed his assignment to collect "street tax." Smith also testified that he was

charged with federal drug conspiracy in 2004 and entered a plea agreement in that case to serve

120 to 180 months in prison in exchange for being a confidential source. Smith testified against

Bray in that case. Smith further recalled that after he met Searcy, the only gang activity he was

involved in was "collecting tax" and he tried to remove himself in 2000 because of his wife and

kids. Further, DEA Agent Konvalinka testified in Smith's case that Smith was a target of an

investigation and he registered Smith as a confidential source. Further, defense counsel examined

Bray about Bray's charge for drug conspiracy in 2004, including that Smith was one of the 48

defendants, there were a lot of drugs involved, Smith testified against Bray in 2006, and Bray

was convicted based on Smith's testimony. We find no clear error occurred where Smith

presented evidence about his prior drug involvement to support his defense.

¶ 106    In addition to Smith's testimony about his prior drug activity and plea agreement, the

jury knew he had the prior drug conviction because the court admitted into evidence a certified

conviction from the United States District Court from March 2007 showing that he was

convicted of conspiracy to possess with intent to distribute a controlled substance. Before trial,

defense counsel acknowledged that the jury would hear about Smith's federal drug conviction

and that he was a drug dealer, as she stated that there were other reasons to explain Bray's and Smith's relationship other than through the gang-related evidence, including that the men were close friends and "dealt drugs together," which was "going to come in because of the federal conviction." Again, no clear error occurred with respect to the State's cross-examination of Smith on his drug activity.

¶ 107    Smith also challenges the State's following remark in closing argument:

"Think about what the Defendant told you just yesterday, drug spots, collecting taxes, $10,000 to $30,000 a week from a spot. You see, folks, there's only one thing that matters more than the lives of two young ladies and that is money, and that's money that mattered to him. Disrespect, he controlled that block. That was his territory. Nobody disrespects him."

As before, Smith raises this challenge for the first time in his reply brief, which is sufficient to preserve the matter for review. We find that no error occurred. Before and after closing arguments, the court instructed the jury that the State's comments were not evidence and to disregard anything they heard that was not based on the evidence. Thus, even if the State's remark was improper, the court corrected any error by instructing the jury. See *Green*, 2017 IL App (1st) 152513, ¶ 99.

¶ 108                              Custodial Status

¶ 109    Smith next contends that during the State's cross-examination of him, the State improperly highlighted his custodial status when it asked, "[H]ow much time do you have left on your sentence right now?", to which he responded, "It's pretty much done." The State then asked, "So I mean you're almost a free man?" Smith responded, "Yes." The State followed up, "Except for this case?" Smith stated, "Yes." Smith asserts that the State blatantly informed the

jury that he was in custody and therefore prejudiced him to such an extent that it was not possible for him to have a fair trial.

¶ 110    Smith did not object at trial or raise the issue in a posttrial motion.[5] As previously discussed, to preserve an issue for review, a defendant must both raise an objection at trial and raise the issue in a posttrial motion. *Enoch,* 122 Ill. 2d at 186. Smith does not argue for plain error review. It is the defendant's burden to establish plain error and a defendant forfeits plain error review when he fails to present an argument on how either of the two prongs is satisfied. *People v. Nelson*, 2013 IL App (1st) 102619, ¶ 69. Smith did not properly preserve the issue for review and has forfeited plain-error review as well.

¶ 111                              Ineffective Assistance of Counsel

¶ 112    Smith next contends he received ineffective assistance of trial counsel because counsel failed to object at trial to the State's improper introduction of evidence related to gang activity, prior bad acts, and his custodial status. He also argues counsel was ineffective for improperly introducing highly prejudicial gang evidence against him and for failing to request a limiting jury instruction regarding the gang evidence introduced by the State. Smith further contends that counsel was ineffective for failing to utilize an expert on eyewitness identifications, cross-examine Bray about his motive to testify falsely, and argue about Bray's motive in closing argument.

¶ 113    To establish a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must establish both

---

[5] Smith requested in his motion *in limine* before trial that the State be barred from eliciting testimony from any witness that Smith was interrogated while at a correctional center and that he was housed at a correctional center when the police transported him to Chicago to be charged in this case.

prongs to prevail on a claim of ineffective assistance of counsel. *People v. Ramirez*, 2018 IL App (1st) 152125, ¶ 15.

¶ 114   With respect to the deficient performance prong, a defendant " 'must prove that counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Jones*, 2017 IL App (1st) 143766, ¶ 41 (quoting *People v. Evans*, 186 Ill. 2d 83, 93 (1999)). To establish that counsel's performance was deficient, the defendant "must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Smith,* 195 Ill. 2d 179, 188 (2000). Because there is a strong presumption that counsel acted adequately, we greatly defer to counsel's decisions. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43. Further, "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *Smith*, 195 Ill. 2d at 188. Effective assistance refers to competent and not perfect representation, so mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *Moore*, 2012 IL App (1st) 100857, ¶ 43. In addition, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. 668 at 689. The "fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful," does not establish ineffective assistance of counsel. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). A defendant "can only prevail on an ineffectiveness claim by showing that counsel's approach was objectively unreasonable." *People v. Bell*, 2021 IL App (1st) 190366, ¶ 79.

¶ 115    To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* A defendant must show that counsel's deficient performance made the result of the trial unreliable or fundamentally unfair. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 116    Smith has failed to establish that counsel was ineffective because he has not overcome the presumption that counsel's decisions were matters and products of sound trial strategy. We first address Smith's claims that counsel was ineffective for improperly introducing gang evidence and for failing to object when the State introduced evidence regarding gang activity, prior bad acts, and his custodial status.

¶ 117    As previously discussed, Smith does not challenge on appeal the trial court's ruling that concluded that the jury should know all the circumstances under which Smith's alleged statements to Bray were made and that the "minimal amount of gang evidence is highly relevant to the circumstances surrounding the alleged statement of the defendant and more probative to the issue than prejudicial to the defendant." The evidence that was introduced through Bray's testimony included Bray's gang membership and rank, that Smith made the statements about the shooting to Bray because "it was my area and I was in charge of the area," and Smith had to report it to Bray due to Bray's rank. The record shows that defense counsel subsequently introduced gang and drug evidence, including his prior plea agreement in the federal drug case, to support his defense and to attack Bray's credibility. Specifically, defense counsel elicited from Bray that Smith had testified against Bray in September 2006 in the federal drug case, which resulted in Bray's conviction, and asked Bray whether Smith had the same rank as him and

whether Bray had "ordered the hit" on him in 2006. Further, Smith then testified about his gang membership and rank, including that it was the same rank as Bray, that he lost his drug spot because he refused to follow an order, he testified against Bray in a drug case in which he was also charged, and before he was sentenced on that case, he was attacked twice. Smith also testified that he had been trying to remove himself from gang activity in 2000 and the only activity he was involved in was collecting tax. Mayfield testified in Smith's defense that the shooter was from a different gang and that Smith was not the shooter.

¶ 118     The record shows that defense counsel used gang and drug evidence to attack Bray's credibility and support his defense. As stated above, a defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or judgment do not, by themselves, render the representation incompetent. *Fuller*, 205 Ill. 2d at 331. Even if counsel's strategy proved unsuccessful or if another attorney might have pursued a different defense strategy, that does not establish that counsel was ineffective. See *id.* Counsel's performance was not deficient when she failed to object to the gang and drug related evidence and when she introduced gang related evidence in Smith's case. Because Smith failed to establish that counsel's performance was deficient, he has not established a claim for ineffective assistance of counsel.

¶ 119     As for Smith's argument that counsel was ineffective for failing to object when the State asked him about his custodial status, the record shows that defense counsel introduced testimony during Smith's direct examination about his 2004 charge for drug conspiracy, including the sentencing range connected to his plea agreement, his role in testifying against Bray in that case, and the subsequent attacks against him, to support his theory that Bray was not credible and had a motive to testify against him. On cross-examination, the State then asked Smith how much time he had left on his sentence, and defense counsel did not object. "It is well

established that a matter developed during a defendant's direct examination is a proper subject of cross-examination." *People v. Stevens*, 40 Ill. App. 3d 303, 306 (1976). Given that defense counsel introduced testimony regarding his 2004 charge and sentence, we cannot find that counsel's decision to not object during the State's cross-examination was so deficient that counsel was not functioning as the "counsel" guaranteed by the sixth amendment. See *Jones*, 2017 IL App (1st) 143766, ¶ 41. Further, as previously stated, the fact that another attorney might have pursued a different strategy does not establish that Smith was denied effective assistance of counsel. See *Fuller*, 2015 Ill. 2d at 331.

¶ 120    Smith next contends that counsel was ineffective for not requesting a limiting jury instruction regarding the gang evidence introduced by the State. Smith asserts that evidence of other crimes carries a risk of unfair prejudice and the best way to address the problem is through the use of a limiting instruction contained in Illinois Pattern Jury Instructions, Criminal No. 3.14 (2014) (hereinafter IPI Criminal 3.14).

¶ 121    It is well settled that a counsel's choice of jury instructions is a matter of trial strategy, and such decisions are generally immune from ineffective assistance of counsel claims. *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. The "failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, if the instruction was so "critical" to the defense that its omission 'den[ied] the right of the accused to a fair trial.' " *People v. Johnson*, 385 Ill. App. 3d 585, 599 (2008) (quoting *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)). "However, the omission of a particular instruction must be judged in light of the other instructions given." *Johnson*, 385 Ill. App. 3d at 599. "Jury instructions are evaluated in their entirety to determine whether they fairly, fully and comprehensively informed the jury of the relevant law." *Id.*

¶ 122    IPI Criminal 3.14 instructs the jury that when evidence of a defendant's other crimes is admitted, they may only consider it for certain purposes. *People v. Maya*, 2017 IL App (3d) 150079, ¶ 93. Smith generally asserts that counsel was ineffective for failing to request a limiting instruction as it related to "gang-evidence and drug-dealing that was admitted." Smith cannot establish that counsel's performance was deficient for failing to request a limiting instruction. As previously discussed, defense counsel used this evidence as part of his defense and was aware of the evidence. Counsel's decision not to request the instruction was a matter of trial strategy. See *People v. Figueroa*, 341 Ill. App. 3d 665, 672 (2003) (decision not to request a limiting instruction on other crimes evidence was considered a matter of trial strategy, noting that the other-crimes evidence was "an integral part of the context of the crime" and "counsel was clearly aware of the nature of the evidence of other crimes, having offered a motion *in limine* with respect to them"); *People v. Mendez*, 318 Ill. App. 3d 1145, 1154 (2001) (decision not to request an instruction limiting the use of gang affiliation may have been a tactical decision to avoid confusing the jury or to avoid focusing the jury's attention on the gang evidence).

¶ 123    Further, Smith testified about his gang membership and prior drug activity, including that he had a "drug spot" that he lost in 2000, collected street tax, and was charged in 2004 for drug conspiracy, after which he entered a plea agreement in exchange for serving as a confidential source. Thus, given that Smith testified about the evidence of the other crimes, he cannot show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. See *Figueroa*, 341 Ill. App. 3d at 672-73 ("Since defendant has testified to the evidence of other crimes, it is hardly likely a limiting instruction would have affected the ultimate outcome of this matter."). Smith has failed to establish that counsel was ineffective for failing to request a limiting instruction.

¶ 124    Smith next contends that trial counsel was ineffective for failing to utilize an expert to testify about the reliability of eyewitness identifications. He asserts that if "expert testimony had been allowed which would have described the pitfalls of eyewitness identification," then the verdict would have been different.

¶ 125    To support his argument, Smith relies on *People v. Lerma*, 2016 IL 118496. In *Lerma*, the supreme court stated that it had previously expressed caution and skepticism against the overuse of expert testimony on the reliability of eyewitness identifications, but that since that time, there had been a "dramatic shift in the legal landscape, as expert testimony concerning the reliability of eyewitness testimony has moved from novel and uncertain to settled and widely accepted." *Id.* ¶ 24. The supreme court stated that "today we are able to recognize that such research is well settled, well supported, and in appropriate cases a perfectly proper subject for expert testimony." *Id.* The supreme court concluded that under the specific facts and circumstances of that case, the circuit court abused its discretion when it denied the defendant's request to present testimony from an expert on the reliability of eyewitness identification. *Id.* ¶ 25. It stated that the circuit court denied the request "for reasons that are both expressly contradicted by the expert's report and inconsistent with the actual facts of the case," which rose "to the level of both arbitrary and unreasonable to an unacceptable degree." *Id.* ¶ 32.

¶ 126    Here, Smith's trial occurred in 2015, and *Lerma* was issued in 2016. Thus, at the time of Smith's trial, *Lerma* was not the law. We therefore cannot find that counsel's performance was deficient. See *Macklin*, 2019 IL App (1st) 161165, ¶ 38 ("Representation based on the law prevailing at the time of trial is adequate, and counsel is not incompetent for failing to correctly predict that the law will change."). In addition, the issue the supreme court had to decide in *Lerma* was whether the trial court abused its discretion when it denied the defendant's request to

present the expert testimony on the reliability of eyewitness identification. Here, however, Smith is arguing that counsel was ineffective for failing to call an expert on the reliability of eyewitness identifications, not that the trial court abused its discretion. As previously stated, "[t]he decision whether to call a particular witness is a matter of trial strategy left to counsel's discretion, and thus generally not a proper basis for an ineffectiveness claim." *Id.* ¶ 36. Further, defense counsel extensively cross-examined the State's witnesses at trial regarding their identifications. Counsel's performance was not deficient for failing to call an expert on the reliability of eyewitness identifications.

¶ 127    Smith further contends counsel was ineffective because she did not cross-examine Bray about his motive to fabricate and did not argue the issue in closing argument. He asserts that one year after Bray testified against Smith, the United States Attorney filed a motion to reduce Bray's sentence in the federal case and the motion specifically referenced Bray's testimony against Smith as part of the reason for the request. He asserts that defense counsel interviewed Bray before trial and cross-examined him at trial, but never asked him if he intended to request a sentence reduction in exchange for testifying against Smith. Smith argues that Bray's answer might have considerably helped explain his motive to fabricate and "it should have been argued to the jury that [Bray's] testimony was motivated by a desire to get his sentence reduced."

¶ 128    "Generally, the examination or impeachment of a witness is considered to be trial strategy, which does not support a claim of ineffective assistance of counsel." *People v. Lacy*, 407 Ill. App. 3d 442, 461 (2011). Here, defense counsel cross-examined Bray about his motive to testify falsely against Smith. Counsel asked Bray about his gang membership and rank and about his knowledge of Smith's rank. Counsel elicited testimony from Bray about his 2004 drug conspiracy charge, including that Smith testified against him and others in 2006, and based upon

Smith's testimony, he received a sentence of 25 years in prison. Counsel also asked Bray about whether he knew that Smith had been attacked twice after that testimony, including asking "Was it you or Troy Martin who ordered the hit on Tyris in 2006?" In closing argument, counsel argued that Bray was retaliating against Smith:

"He's getting back at him. He's retaliating. And he tried it twice, somebody tried it twice. Tyris has been attacked while he was cooperating with the DEA twice. I wonder who did that. That didn't work, clearly. So when he reads about the 2011 arrest, it's my chance, it's my chance to get back. He took down me and Troy. I'm going to see to it that he and Country go down. And that's what he's trying to do, but you're too smart for him. He thinks he's smart, but he's not going to fool you."

Accordingly, the record shows that defense counsel cross-examined Bray about his motive to testify falsely against Smith and argued Bray's motives to the jury in closing argument. As previously stated, the fact that another attorney might have chosen a different strategy with the benefit of hindsight or may have impeached Bray differently does not mean counsel's performance was deficient. See *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31.

¶ 129    In addition, we note that to support Smith's argument that counsel was deficient for not cross-examining Bray about his intention to ask for a sentence reduction in exchange for his testimony in this case, Smith cites a motion to reduce sentence that was filed in Bray's federal case on January 15, 2016. In July 2020, this court entered an order grating Smith's request for this court to take judicial notice of the motion to reduce sentence. The motion states in part that Bray had assisted in Smith's case by testifying at Smith's trial in 2015. However, the jury reached a verdict in Smith's case on January 16, 2015, which was one year before the motion was filed in Bray's federal case. Defense counsel did not have the motion at the time of trial and

as previously stated, "[a] fair assessment of attorney performance requires that every effort be made to *** evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. 668 at 689. Counsel's approach in cross-examining Bray about his motive to testify falsely was not objectively unreasonable. Lastly, we note that during posttrial briefing, on September 22, 2016, defense counsel filed a second supplemental posttrial motion, in which counsel stated that on January 15, 2016, the U.S. Attorney filed a motion to reduce sentence in Bray's federal case, which was based in part on Bray's testimony against Smith, and proved the defense theory that Bray was disingenuous and cooperating with the State for his own benefit. Counsel's performance was not deficient, and Smith's ineffective assistance claim based on this issue fails.

¶ 130                                    III. CONCLUSION

¶ 131        For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 132        Affirmed.